**John DOE, (a pseudonym) c/o undersigned attorneys, Plaintiff,**

v.

**WILLIAM SHAPIRO, ESQUIRE, P.C., Walnut Equipment Leasing Company, Equipment Leasing Company of America, Welco Securities, Kenneth Shapiro, and William Shapiro, 101 West City Avenue, Bala Cynwyd, Pa., 19004, Defendants.**

**Civ. A. No. 94–0925.**

United States District Court, E.D. Pennsylvania.

April 26, 1994.

---

Martin M. Krimsky, Mitchell Feigenbaum, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, PA, for plaintiff.

Ellen Brown Furman, Fredric L. Goldfein, Goldfein & Joseph, Robert Patrick Coleman, Philadelphia, PA, for defendants.

## MEMORANDUM

GAWTHROP, District Judge.

This case concerns allegations by an attorney, suing under the name John Doe, that he was discharged from his position at the law firm William Shapiro, Esquire, P.C., because he was diagnosed with AIDS. The complaint includes claims under the Americans with Disabilities Act (Count I), the Pennsylvania Human Relations Act (Count II), and under Pennsylvania common law for intentional infliction of emotional distress (Count III). Upon the following reasoning, I shall deny the motion as to Counts I and II, and grant it as to Count III.

The defendants move under Fed. R.Civ.P. 12(b)(1) to dismiss Count I, a claim under the Americans with Disabilities Act ("ADA" or "the Act"), for lack of subject

matter jurisdiction. Their attack is not directed at the manner in which jurisdiction is pled, but rather calls into question the actual existence of jurisdiction. *See Young v. Francis,* 820 F.Supp. 940, 943 (E.D.Pa.1993) (explaining distinction between facial and factual attacks on jurisdiction). Whereas on a motion to dismiss under Rule 12(b)(6) the plaintiff is entitled to have all reasonable inferences drawn in his favor, when jurisdiction is challenged under Rule 12(b)(1), the burden is on the plaintiff to prove jurisdiction exists. *Lattanzio v. Security Nat'l Bank,* 825 F.Supp. 86, 88 (E.D.Pa.1993). In assessing a Rule 12(b)(1) motion, the parties may submit and the court may consider affidavits and other relevant evidence outside the pleadings. *Berardi v. Swanson Memorial Lodge No. 48 of Fraternal Order of Police,* 920 F.2d 198, 200 (3d Cir.1990); Charles A. Wright & Arthur R. Miller, 5A Federal Practice and Procedure: Civil 2d § 1350, at 213 (1990).

The defendants claim that because Mr. Doe was one of only, at most, ten people employed by William Shapiro, Esq., P.C. ("the Shapiro Law Firm"), the firm is not covered by the ADA. The ADA defines the term employer as:

> a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

42 U.S.C. § 12111(5)(A).[1] The plaintiff argues that all of the defendants should be consolidated for the purposes of meeting the ADA's jurisdictional requirement. The defendants concede that if this is done, the ADA's 25–employee floor is met.

■ When examination of several nominally separate corporate entities reveals that they essentially "function as one integrated enterprise," the court may treat them as a single employer under the Act. *Beckwith v. International Mill Servs.,* 617 F.Supp. 187, 189 (E.D.Pa.1985). Courts have typically considered four-factors in making this determination: (1) the interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control existing among the several entities. *Berkowitz v. Allied Stores of Penn–Ohio, Inc.,* 541 F.Supp. 1209, 1215 (E.D.Pa.1982); *Beckwith,* 617 F.Supp. at 189; *Ratcliffe v. Insurance Co. of North America,* 482 F.Supp. 759, 764 (E.D.Pa.1980). In applying this four-factor test, courts appear to take a "totality of the circumstances" approach to the issue, treating the factors as guideposts rather than as items on a checklist. With this background in mind, I turn to application of the test.

■ *Interrelation of Operations:* Although the defendants contend that each defendant is engaged in a separate industry affecting commerce, it is more accurate to state that each contributes something to a single, common enterprise—leasing equipment and selling securities backed by the accounts receivable on the leases. The integrated nature of this operation is illustrated, most simply, by the "Official Walnut Phone List" for November of 1992, which lists the Shapiro Law Firm attorneys under the heading "Legal Department." (Pls.' Mem. of Law at 28). A more in-depth investigation of the defendants' relationships reveals the same thing—the Shapiro Law Firm functioned as the legal arm of the Walnut companies, managing collections on unpaid leases.

Walnut Equipment Leasing Co., Inc., a Delaware corporation ("Walnut–Delaware") and Walnut Equipment Leasing Co., Inc., a Pennsylvania corporation ("Walnut–Pennsylvania") are in the business of leasing equipment. (Depos. of William Shapiro at 30–32). Walnut–Pennsylvania has no employees, and functions only through its parent, Walnut–Delaware. (Depos. of William Shapiro at 32). Equipment Leasing Corporation of America ("ELCOA") is also in the equipment leasing business. (Depos. of William Shapiro at 36). Instead of originating leases, however, it purchases them from Walnut–Delaware. (Depos. of William Shapiro at 37). Walnut–Delaware uses the money it gains from sell-

---

1. The 25–employee floor applies only for the first two years following the effective date of the law. 42 U.S.C. § 12111(5)(A). After that, the statute will apply to employers with 15 or more employ-ees. *Id.* The ADA became effective 24 months after enactment, on July 26, 1992. Thus, the 25–employee cut off applies through July 26, 1994, and is applicable in this case.

ing leases to ELCOA and Walnut–Pennsylvania to purchase more equipment to be leased. (Depos. of William Shapiro at 45).

Welco Securities, Inc. is a licensed broker/dealer. (Depos. of William Shapiro at 52). ELCOA and Walnut–Delaware sell debenture securities through Welco Securities, Inc. (Depos. of William Shapiro at 52 & 56). It is from the sale of debenture securities that ELCOA obtains funds with which to purchase equipment leases from Walnut–Delaware. Financial Data, Inc. is a transfer agent that transfers ownership of securities and maintains records on behalf of Welco Securities, Inc. (Depos. of William Shapiro at 67). On the Official Walnut Phone List, the employees of Financial Data, Inc. are listed under the heading Welco Securities, and their paychecks are drawn on Walnut–Delaware. (Depos. at 68–69).

At least 90%, and possibly as many as 99%, of the cases handled by the Shapiro Law Firm during the relevant period were on behalf of Walnut–Delaware. (Pls.' Mem. of Law, at 13 & Ex. F). During the period of Mr. Doe's employment, when its own equipment leases or those of Walnut–Pennsylvania or ELCOA went into default, Walnut–Delaware would forward the lease files to William Shapiro. (Depos. of William Shapiro at 100–101). For leases outside of Pennsylvania, New York and New Jersey, a paralegal employed by Walnut–Delaware would prepare a complaint and draft correspondence in the name of the Shapiro Law Firm, under the supervision of Mr. Shapiro. (Depos. of William Shapiro at 103–105). All of the initial collection efforts, including preparation of demand letters and delivery of the judgment to the sheriff, were performed by Walnut–Delaware paralegals in the name of the Shapiro Law Firm. After 45 days, if the claim had not been resolved, the file was transferred to an attorney employed by the Shapiro Law Firm. (Depos. of William Shapiro at 105). Defaulted leases in Pennsylvania, New York, or New Jersey were transferred to a Shapiro attorney immediately. Once they received the files, it was the responsibility of the Shapiro Law Firm attorneys to collect on the defaulted leases and close the files, either by working with out-of-state counsel or by taking action locally.

The defendants have created a corporate labyrinth with each putatively independent entity intertwined with the business of the other. Most telling is the fact that employees of Walnut–Delaware routinely performed work in the name of the Shapiro Law Firm and its attorneys. It is apparent that the law firm in executing the final phase of Walnut–Delaware's collections efforts merely functioned as one component of an elaborate business plan.

In addition to being functionally interrelated, the defendants share an office suite, fax lines, printing services, and an "800 number." Walnut–Delaware, Walnut–Pennsylvania, WELCO Securities, Inc., and the Shapiro Law Firm are located at 101 West City Avenue, Bala Cynwyd, Pennsylvania. (Depos. of William Shapiro at 30, 32, 63, Aff. of John Doe, ¶ 5). In addition, the employees of Financial Data, Inc. are located at this address. (Depos. of William Shapiro at 66). Although ELCOA has a Delaware address, the company does not maintain a representative there on a regular basis. The files stored at the Delaware suite are created at 101 West City Avenue, Bala Cynwyd and transported to Delaware by Kenneth Shapiro. (Aff. of John Doe, ¶¶ 3, 4). The receptionist at the Delaware office provides callers with a 800 number which accesses the Walnut Equipment Leasing voice mail system. As reflected by the Official Walnut Phone List, which lists only a three digit extension for each person, employees of Walnut, Welco Securities, Inc., and the Shapiro Law Firm communicate on a unified phone system. (Pls.' Mem. of Law at 28).

At the Bala Cynwyd office, each corporate defendant designates a separate door as its entrance; however, all of the doors lead to a single, contiguous work area in which employees of the various defendants are grouped by function. Demarcations between work areas are by book shelves, cubicles, and walls. (Aff. of John Doe, ¶ 9). Employees of the various defendants move freely between work areas, and it is common for them to share office furniture, supplies, and copy machines. (Aff. of John Doe, ¶ 9). Mr. Doe's

health insurance, as an employee of the Shapiro Law Firm was provided by Walnut Equipment Leasing Co., Inc., and his paycheck, drawn on Shapiro Law Firm accounts, was sent in a Walnut Equipment Leasing Co., Inc. envelope. (Aff. of John Doe, ¶¶ 7, 8).

The defendants argue that because they each maintain separate pay rolls, books, records, and bank accounts, and because they file separate tax returns, the interrelation of operations requirement is not met. While these factors may be indicia of separateness, when compared with the overwhelming evidence of integration detailed above, they are not dispositive. The Shapiro's holdings are designed to, and indeed do, operate as a coherent whole. Thus, I conclude the interrelation of operations prong is fulfilled.

*Common Management:* Defendant William Shapiro and defendant Kenneth Shapiro are the top two officers of every corporate defendant. Specifically, William Shapiro is President of the Shapiro Law Firm, Walnut Equipment Leasing Co., Inc., Equipment Leasing Corporation of America, Financial Data, Inc., and Walnut Associates. He is Secretary/Treasurer of Welco Securities, Inc. Kenneth Shapiro is Secretary/Treasurer of the Shapiro Law Firm, Vice–President of Walnut Equipment Leasing Co., Inc., Equipment Leasing Corporation of America, and Walnut Associates, and President of Welco Securities, Inc. (Pls.' Mem. of Law, Ex. E, at 2–3, and Depos. of William Shapiro at 16–26, 67). Thus, management and control of the nominally independent defendant corporations is effectively centralized in the hands of William and Kenneth Shapiro.

*Centralized Control of Labor Relations:* The plaintiff during his tenure observed that "William and Ken Shapiro, separately and jointly controlled every significant aspect of labor relations and personnel policy on a day-to-day basis for all operations at 101 West City Avenue." (Aff. of John Doe, ¶ 10). William Shapiro was responsible for managerial hiring at Walnut–Delaware and Financial Data, Inc. (Depos. of William Shapiro at 87–88). Mr. Shapiro, on at least one occasion, suggested that a Walnut–Delaware employee change positions and work for Financial Data, Inc. instead. After this suggestion was made, "[the employee's] services were terminated by Walnut Equipment Leasing Co., Inc. and a second later, he became the manager of Financial Data, Inc." (Depos. of William Shapiro at 86).

As evidenced by Mr. Doe's experience, Mr. Shapiro also has and exercises hiring and firing authority at the Shapiro Law Firm. Kenneth Shapiro worked with William Shapiro to review the work of Shapiro Law Firm attorneys to determine whether their employment should be continued or terminated. (Pls.' Mem. of Law, Ex. F, at 4–5). Although the Shapiros delegated some authority for hiring and supervising clerical and secretarial staff, this authority was exercised under the Shapiro's supervision. (Aff. of John Doe, ¶ 10). These facts lead me to conclude that no employment decision of any great significance is made without direct involvement of one or both of the Shapiros. They maintain and exercise control over labor policies at all of the defendant corporations.

*Common Ownership or Financial Control:* As to ownership of the defendant corporations, William Shapiro holds, either directly or indirectly, 100% of the stock of each entity. He personally owns 100% of the stock of Welco Securities, the Shapiro Law Firm, and Financial Data, Inc. (Depos. of William Shapiro at 14, 16, & 66). All of the stock of Walnut—Pennsylvania is held by Walnut—Delaware (Depos. of William Shapiro at 12–13), as is the stock of ELCOA (Depos. of William Shapiro at 14). One hundred percent of the stock of Walnut—Delaware is held by Walnut Associates. (Depos. of William Shapiro at 12). Mr. Shapiro owns 100% of the stock of Walnut Associates. (Depos. of William Shapiro at 13). Mr. Shapiro's "common ownership" of the defendants appears to be well established.

*Conclusion:* Having reviewed in detail the plaintiff's assertion that the defendants should be consolidated for the purpose of meeting the 25–employee floor of the ADA, I conclude there is ample factual basis for treating the defendants as an integrated enterprise. As illustrated above, the relationships among the defendant corporations satisfy all of the criteria which courts have used

in making this determination. The defendants are functionally integrated, managerial control is centralized in William and Kenneth Shapiro, and financial control over all defendants is maintained by William Shapiro. Accordingly, the motion under Federal Rule 12(b)(1) will be denied.

■ The defendants also move for dismissal of Count I against Kenneth Shapiro in his official capacity. While some courts have disallowed Title VII suits against individuals entirely, *see Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583, 587–88 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994), a number of courts have permitted an individual with supervisory authority to be sued under Title VII. *See, e.g., Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993); *Harvey v. Blake,* 913 F.2d 226, 227 (5th Cir.1990); *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir. 1989), *vacated in part, en banc,* 900 F.2d 27 (4th Cir.1990). These courts have relied primarily on the statute's definition of "employer," which includes any agent of the employer. I agree with this interpretation and find it persuasive in the context of the ADA, which shares the same language regarding agents of the employer.

■ In the complaint, the plaintiff alleges that the decision to terminate his employment was "made, agreed to, and/or ratified by all defendants." Drawing all reasonable inferences in the plaintiff's favor, as I must at this stage, I find this sufficient basis for keeping in the claim against Kenneth Shapiro. If he exercised supervisory responsibility over Mr. Doe, participated in the evaluation of Mr. Doe's work, or assisted in making the decision to discharge Mr. Doe, he may qualify as an agent of the employer and be sued under the ADA.

The defendants also move for dismissal of the ADA claim against both William and Kenneth Shapiro in their individual capacities. The case law on the issue of individual capacity suits under Title VII is conflicting and confused. Some courts which have permitted suits against individual defendants, have limited the scope of these claims to their official capacities. *See, e.g., Sauers* and *Harvey, supra, Violanti v. Emery World-*

*wide,* 847 F.Supp. 1251 (M.D.Pa.1994), *Timmons v. Lutheran Children & Family Servs.,* No. 93–4201, 1993 WL 533399, * 5, 1993 U.S.Dist. LEXIS 18,011, * 13–* 16 (E.D.Pa. Dec. 17, 1993), *Barger v. Kansas,* 630 F.Supp. 88, 90–91 (D.Kan.1985). These courts reason that individual defendants are only covered by the statute because they exercise authority conferred upon them by the employer; thus suits for abuse of this authority should be against them in their official capacities. They also argue that the relief available under Title VII, such as back pay, is of the type one would expect an employer to provide.

Other courts have held that individuals may be sued in both their official and individual capacities. *See, e.g., Vakharia v. Swedish Covenant Hosp.,* 824 F.Supp. 769, 784–86 (N.D.Ill.1993), *Bridges v. Eastman Kodak Co.,* 800 F.Supp. 1172, 1179–80 (S.D.N.Y. 1992), *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1527 (M.D.Fla.1991). In reaching this conclusion, they rely on the deterrent intent of Title VII, and the inference that Congress would not have intended that individuals who actually engaged in discriminatory conduct would escape liability. They also point out that since the Civil Rights Act of 1991 made available compensatory and punitive damages, relief under Title VII is no longer of a type associated only with the employer.

■ Still other courts have viewed the individual/official capacity distinction as irrelevant. *See Hanshaw v. Delaware Technical & Community College,* 405 F.Supp. 292, 296 (D.Del.1975); *Kelly v. Richland School Dist.,* 463 F.Supp. 216, 218 (D.S.C.1978). They reason that in the context of suits under Title VII the concepts of official and individual capacity present a false dichotomy. I find the reasoning of this third group of courts persuasive.

The distinction between official and individual capacity is derived from cases arising under 42 U.S.C. § 1983, which requires that defendants act "under color of state law." Because of this requirement, when state employees, acting without authorization, violate a person's constitutional rights, the question

arises whether their actions can be viewed as having been taken under color of state law. The Supreme Court held in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled in part on other grounds by, Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); that actions taken by state officers in their official capacity, even if in violation of state law or policy, constitute action under color of state law. After *Monroe,* the focus in § 1983 cases was on whether an individual defendant was "clothed with the authority of state law" when the constitutional violation occurred. *Monroe,* 365 U.S. at 184, 81 S.Ct. at 482 (citation omitted).

■ Section 1983 regulates the relationship between state officials and individuals; thus, the threshold question in a § 1983 suit is whether the defendant was a state actor, acting in an official capacity, at the time of the alleged constitutional violation. In contrast, Title VII and the ADA regulate the relationship between employers and employees. As a result, in Title VII and ADA cases, the relevant threshold question is not whether the defendant acted in an official capacity, but whether the defendant is the plaintiff's employer under the statute. If the defendant is an employer, as defined by the statute, he or she may be sued under Title VII or the ADA. Because the scope of the injuries redressable under these statutes is already circumscribed by the employment relationship, to consider further the capacity in which the defendant acted is not a relevant distinction, as it is under § 1983. As one court has explained:

> Whether [the alleged discriminatory conduct] took place as a private person or as an officer is of no import here. Title VII actions do not contain the 'under color of state law' problems associated with section 1983 actions. If the person against whom the complaint is filed is within the definition of 'employer,' his 'capacity' during the alleged discriminatory events is irrelevant, so long as the alleged discrimination relates to employment....

*Hanshaw,* 405 F.Supp. at 296 n. 10; *see also Kelly,* 463 F.Supp. at 218 (quoting *Hanshaw*). Moreover, this seems particularly

true in the situation where the defendant is a private employer.

I conclude that the defendants' motion to dismiss the ADA claims against William and Kenneth Shapiro in their individual capacities relies on a distinction without a basis in the law. The defendants implicitly acknowledge in their brief that individuals may be sued under Title VII, and I agree (see discussion *supra*). Thus, since both individuals, at least at this stage, may be viewed as employers under Title VII, the ADA claims against them shall not be dismissed.

Defendants' motion argues for dismissal of Count II, a state law claim under the Pennsylvania Human Relations Act, on the assumption that the court would find it lacked subject matter jurisdiction over Count I under the Americans with Disabilities Act. Having concluded that the court does have jurisdiction over the ADA claim, it follows that the court also has jurisdiction over Count II under the doctrine of supplemental jurisdiction. *See* 28 U.S.C. § 1367(a) (1993). Accordingly, the motion will be denied as to Count II.

The defendants argue that the plaintiff's claim for intentional infliction of emotional distress is barred by the exclusivity provision of the Pennsylvania Workmen's Compensation Act, 77 P.S. §§ 1–1522. That provision states:

> The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes ... in any action at law or otherwise on account of any injury or death....

77 P.S. § 481(a).

■ The defendant's position is accurate. As Judge Pollak discussed in *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1143–44 (E.D.Pa.1990), the Supreme Court of Pennsylvania in *Poyser v. Newman & Co.,* 514 Pa. 32, 522 A.2d 548 (1987), held that the workmen's compensation statute provides the exclusive remedy for workplace related injuries, "even where the injury is alleged to be intentional." *Kinnally,* 748 F.Supp. at 1143. Relying on *Poyser,* several federal courts have held that the statute precludes recovery

for intentional infliction of emotional distress against an employer. *Id.*

The plaintiff seeks to distinguish *Kinnally* and other similar cases because in addition to the actual act of discharge, those cases involved other wrongful conduct such as harassment. He asserts that because of this additional pre-discharge misconduct, those cases were more appropriately categorized as involving workplace injuries. In contrast here, the plaintiff argues, there was no discriminatory conduct that preceded Mr. Doe's firing.

The court rejects the plaintiff's theory on two bases. First, the complaint does allege some improper conduct by the defendants during the brief time between his informing them of his disease and the termination of his employment. The complaint avers that on or about December 1, 1992, Mr. Doe informed William Shapiro that he had been diagnosed with AIDS, (Compl. ¶ 20), and that between December 1 and December 9, the date he was fired, "William Shapiro's attitude towards DOE became one of indifference and hostility." (Compl. ¶ 21).

The more serious flaw in the plaintiff's argument, however, is that the distinction he seeks to make is not borne out in the case law. A number of judges on this court have held, in situations where the plaintiff complains only of a discriminatory discharge and not of prior misconduct, that the Workmen's Compensation Act still bars a claim of intentional infliction of emotional distress. *See, e.g., Geary v. Visitation of the Blessed Virgin Mary Parish Sch.,* No. 92–5769, 1992 WL 392599, * 2, 1992 U.S.Dist. LEXIS 19,693, * 5 (E.D.Pa. Dec. 17, 1992) (intentional infliction of emotional distress claim barred where plaintiff alleges termination in violation of Age Discrimination in Employment Act), *aff'd in part and vacated in part,* 7 F.3d 324 (3d Cir.1993); *McMahon v. Impact Sys., Inc.,* No. 91–6060, 1992 WL 95920, * 2, 1992 U.S. Dist. LEXIS 5835, * 8 n. 2 (E.D.Pa. Apr. 15, 1992) (intentional infliction of emotional distress claim barred where plaintiff alleges discriminatory discharge based on gender); *Levito v. Hussmann Food Serv. Co.,* No. 89–5967, 1991 WL 86898, * 4, 1991 U.S. Dist. LEXIS 6705, * 15 (E.D.Pa. May 15, 1991) (intentional infliction of emotional distress claim barred where plaintiff alleges retaliatory discharge); *Sibley v. Faulkner Pontiac–GMC, Inc.,* No. 89–7303, 1990 WL 116226, * 7, 1990 U.S.Dist. LEXIS 10,292, * 23 (E.D.Pa. Aug. 7, 1990) (intentional infliction of emotional distress claim barred where plaintiff alleges discriminatory discharge based on health). I see no reason to depart from this line of reasoning, especially absent any indication that the Pennsylvania courts would so intend.

The plaintiff cites *Burns v. United Parcel Serv., Inc.,* 757 F.Supp. 518, 526 (E.D.Pa. 1991) for support. In *Burns,* the court determined that the workmen's compensation statute did not bar a claim for personal injuries, including emotional damages, suffered when the defendant wrongfully discharged the plaintiff in retaliation for filing a Workmen's Compensation claim. In so holding, the court relied on *Alexander v. Red Star Express Lines, Inc.,* 646 F.Supp. 672, 679 (E.D.Pa.1986), *aff'd,* 813 F.2d 396 (3d Cir. 1987). Both *Burns* and *Alexander* concerned cases of retaliatory discharge for filing a workmen's compensation claim, not claims of intentional infliction of emotional distress. *See Sibley,* 1990 WL 116226 at * 7, 1990 U.S.Dist. LEXIS at * 24 n. 13 (noting the distinction between *Alexander* and an emotional distress claim). I thus do not find their conclusions persuasive.

For the reasons discussed above, I find that the plaintiff's claim against his employer for intentional infliction of emotional distress is barred by the Pennsylvania Workmen's Compensation Act.

Even if it were not barred, however, the facts alleged do not support a claim of intentional infliction of emotional distress. A viable claim of intentional infliction of emotional distress must allege conduct that is "'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community....'" *Rinehimer v. Luzerne County Community College,* 372 Pa.Super. 480, 539 A.2d 1298, 1305 (quoting *Jones v. Nissenbaum, Rudolph & Seidner,* 244 Pa.Super. 377, 383 368 A.2d 770, 773

(1976)), *appeal denied*, 521 Pa. 606, 555 A.2d 116 (1988).

In *Cox v. Keystone Carbon Co.*, 861 F.2d 390 (3d Cir.1988), the defendant allegedly fired the plaintiff on his first day back to work after undergoing triple bypass surgery in order to interfere with the plaintiff's ability to obtain certain disability and medical benefits. Drawing all inferences in the plaintiff's favor, the court assumed that the employer recognized that the plaintiff's "physical and emotional recuperation were not complete," and that its action would "endanger[ ] his chances of collecting medical and disability benefits," "depriv[e] him of a valuable therapeutic tool and jeopardiz[e] his chances to obtain alternate employment." *Id.* at 395. Nevertheless, the Third Circuit concluded that the employer's action was not sufficiently egregious to fall within the extremely narrow field of conduct which Pennsylvania recognizes as outrageous in the employment context. The court stated that the dismissal of an employee, even if done with "an improper motive," when "examined with Pennsylvania precedent as the relevant backdrop, do[es] not appear to rise to the level of outrageousness which is required under Pennsylvania law." *Id.* at 396.

The plaintiff, in his brief, argues that the jury could reasonably conclude that when the defendants discharged Mr. Doe they acted for discriminatory, selfish, or even vindictive reasons. Were the jury to so conclude, it would only establish that the defendants discharged Mr. Doe with an improper motive. Under *Cox*, such conduct is not sufficient to support a claim of intentional infliction of emotional distress. For both of the reasons discussed above, the motion will be granted as to Count III.

■ Punitive damages are available under the ADA, as amended by the Civil Rights Act of 1991, under the Pennsylvania Human Relations Act, and under Pennsylvania common law. Under the ADA such damages may be awarded "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

Pennsylvania has adopted section 908(2) of the Restatement (Second) of Torts, which provides that:

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

*Burke v. Maassen*, 904 F.2d 178, 181 (3d Cir.1990) (quoting Restatement (Second) of Torts § 908(2)). The Third Circuit has predicted that the Pennsylvania Supreme Court would adopt the narrow interpretation of the "reckless indifference" test which was articulated by a plurality of the Pennsylvania Supreme Court in *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088, 1097 (1985). Under that interpretation, punitive damages are awarded only for "acts done with a bad motive" *Martin*, 494 A.2d at 1097, or where the defendant, though realizing the risk to another, "acted in conscious disregard or indifference to it." *Burke*, 904 F.2d at 182.

The complaint alleges that the defendants discharged the plaintiff approximately eight days after he disclosed to them that he had been diagnosed with AIDS. The complaint alleges that the defendants had not suggested to the plaintiff, before he was discharged, that his work was unsatisfactory. It alleges further that the plaintiff had received a raise within a month before he was discharged. It also alleges that the defendants were motivated by "unjustified and illegal presumptions and fears about AIDS." (Compl. ¶ 24). Drawing all reasonable inferences in the plaintiff's favor, these allegations provide a basis for concluding that the defendants may have acted with the requisite malice or bad motive, or with reckless indifference to Mr. Doe's rights under the ADA and/or PHRA. *Cf. Cain v. Hyatt*, 734 F.Supp. 671, 686 (E.D.Pa.1990). Accordingly, the motion to

dismiss the claim for punitive damages will be denied.

An order follows.