Cheryl BISHOP, Plaintiff

v.

OKIDATA, INC., Chuck Kocher, and Stephen Boyd, Defendants.

Civ. A. No. 94–1932 (JEI).

United States District Court, D. New Jersey.

Oct. 3, 1994.

Mozenter & Mozenter by Joyce S. Mozenter, Haddonfield, NJ, and Abramson, Freedman & Thall by Bruce L. Thall (Argued), Philadelphia, PA, for plaintiff.

Obermayer, Rebmann, Maxwell & Hippel by James M. Penny, Jr., Philadelphia, PA, for defendants.

IRENAS, District Judge:

Plaintiff Cheryl Bishop ("Bishop") brought this action against defendants Okidata, Inc. ("Okidata"), Chuck Kocher ("Kocher"), and Stephen Boyd ("Boyd") (collectively the "defendants"), alleging that as her employers they discriminated against her on the basis of her disability. Bishop also appended breach of contract and intentional infliction of emotional distress claims under New Jersey state law. The case is now before the court on defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). The motion is granted in part and denied in part.

## I. BACKGROUND

Okidata produces computer peripheral equipment for personal and business applications. In May of 1986, Okidata hired Bishop as a Program Administrator in its Mount Laurel, New Jersey, office, with a starting salary of $29,700.

At all times relevant to this matter, Okidata employed Kocher as its Senior Marketing Manager and Boyd as its Director of Customer Service. In these positions, Kocher was responsible for supervising Bishop, and Boyd was responsible for supervising both Kocher and Bishop.

At the end of 1986, Bishop was diagnosed with cancer. Bishop's allegations, which are taken as true for the purposes of this motion, indicate that defendants repeatedly discriminated against her because of this disability.

First, shortly after Bishop was diagnosed with cancer, Okidata's President announced her disability at a management meeting, in violation of company policy regarding confidentiality of employee medical history. (Complaint ¶ 13). Then, between November, 1988, and April, 1993, Bishop applied and was passed over for ten jobs for which she was qualified. (Complaint ¶ 16). Okidata also ordered Bishop to return to work two weeks after her first cancer surgery, refused to allow her to leave work for chemotherapy treatments, demoted her, decreased her salary, made negative comments regarding her cancer at performance evaluations, and failed to advise her of training opportunities. (Complaint ¶¶ 18 and 22). This discrimination continued through April, 1993 (Complaint ¶ 19).

Bishop also claims that Boyd and Kocher individually discriminated against her. In April, 1993, Boyd falsely accused Bishop of spreading rumors regarding her former supervisor and threatened her with discharge. (Complaint ¶ 20). Kocher forced Bishop to work on projects for which she lacked adequate training, excluded her from company-

wide training, reprimanded her for taking vacation days, and stated that Okidata should not allow her any vacation because of the number of sick days she took. (Complaint ¶¶ 30–34).

## II. RULE 12(b)(6) STANDARD

■ Fed.R.Civ.P. 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, the court must accept the allegations of the complaint as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

■ Although the court must assume that all alleged facts are true, "[i]t is not … proper to assume that the [plaintiff] can prove any facts that it has not alleged." *Associated General Contractors of Calif., Inc., v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983). Also, when "[c]onfronted with [a 12(b)(6) ] motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania v. PepsiCo, Inc.,* 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

## III. DISCUSSION

### A. Bishop's Claims Under the ADA

■ Count One of Bishop's complaint asserts that defendants discriminated against her in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* Count Two alleges that defendants intentionally discriminated against her, and requests compensatory and punitive damages under 42 U.S.C. § 1981a. Defendants request that these claims be dismissed to the extent that they arose before July 26, 1992, the effective date of the relevant portion of the ADA.

Section 107(a) of the ADA, 42 U.S.C. § 12117(a), gives those who face disability discrimination in the workplace the same remedies as those who are discriminated against on the basis of race or gender in violation of Title VII, 42 U.S.C. § 2000e. Section 1981a allows those with disabilities who face intentional discrimination to recover compensatory and punitive damages. 42 U.S.C. § 1981a(a)(2).

Section 107 of the ADA, however, did not become effective until July 26, 1992, twenty-four months after its enactment. *See* Pub.L. No. 101–336 § 108, 104 Stat. 337 (1990). Defendants argue that Section 107 does not apply retroactively, and that therefore they are not liable for any allegedly discriminatory acts that took place before Section 107's effective date.

The court first notes that "virtually all of the courts considering whether the ADA applies retroactively have concluded that it does not." *Aramburu v. Boeing Co.,* No. 93–4064, 1993 WL 544567, at *2 (D.Kan. Dec. 29, 1993). *See also Thompson v. Johnson & Johnson Management Info. Ctr.,* 783 F.Supp. 893, 898 (D.N.J.1992), *aff'd mem.,* 993 F.2d 226 (3d Cir.1993); *Raya v. Maryatt Industries,* 829 F.Supp. 1169, 1174–75 (N.D.Cal. 1993); *Verdon v. Consolidated Rail Corp.,* 828 F.Supp. 1129, 1140–41 (S.D.N.Y.1993). Furthermore, the Supreme Court has recently held that the 1991 amendments to the Civil Rights Act, including Section 1981a, do not apply retroactively, bolstering the conclusion that the ADA should apply prospectively only. *Landgraf v. U.S.I. Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1508, 128 L.Ed.2d 229 (1994); *Rivers v. Roadway Express,* —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).

■ *Landgraf* and *Rivers* made clear that courts should not apply statutes affecting substantive rights retroactively absent a clear congressional intent to the contrary. *Landgraf,* —— U.S. at ——, 114 S.Ct. at 1499; *Rivers,* —— U.S. at ——, 114 S.Ct. at 1515. The ADA certainly affects substantive rights, and Bishop does not argue otherwise. Furthermore, Bishop does not point to any congressional intent that the statute should

apply retroactively, and we discern none on our own. Thus, we hold that the ADA does not apply retroactively.

Bishop offers two innovative, but ultimately unsuccessful, arguments to avoid the reach of *Landgraf* and *Rivers*. First, she points out that the precise question at issue in *Landgraf* and *Rivers* was whether the Civil Rights Act of 1991 should apply to cases *pending* at the time of its enactment. *See Landgraf*, —— U.S. at ——, 114 S.Ct. at 1489; *Rivers*, —— U.S. at ——, 114 S.Ct. at 1514. Bishop, on the other hand, did not bring suit until after Section 107 of the ADA became effective.

Second, Bishop argues that much of defendants' conduct took place after the *enactment* of the ADA, but before its effective date. Bishop argues that defendants therefore had notice that their conduct was unlawful discrimination at the time that it occurred, and may be held liable for it in a suit brought after the effective date of the ADA. In sum, this argument states that the date of enactment governs when conduct became unlawful, while the effective date only governs when an injured party may bring suit to enforce the provisions of the ADA.

A careful reading of *Landgraf* and *Rivers*, however, counsels against accepting Bishop's arguments. First, while these opinions did in fact address cases pending at the time of enactment of the ADA, they both speak in terms of the law effective at the time the allegedly discriminatory *conduct* occurred.

*See Landgraf*, —— U.S. at ——, 114 S.Ct. at 1508 (holding that Section 1981a does not "apply to cases *arising before* its enactment") (emphasis added); *Rivers*, —— U.S. at ——, 114 S.Ct. at 1520 (holding that Section 102 of the Civil Rights Act of 1991 "does not apply to *preenactment conduct*.") (emphasis added). Therefore, it is the time that the conduct occurred, not whether the plaintiff brought suit after the effective date of the statute, that determines whether the plaintiff has an action under the statute.

Second, Bishop's argument that conduct occurring after enactment but before the effective date of Section 107 is actionable in a suit brought after the effective date is unpersuasive. As *Landgraf* made clear, it is "the law *in effect* at the time the discriminatory conduct occurred" that controls, —— U.S. at ——, 114 S.Ct. at 1489 (emphasis added),[1] and Section 107 of the ADA, by its own terms, did not become effective until July 26, 1992. *See also Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) ("A law is retrospective if it changes the legal consequences of acts completed before its *effective date*.") (emphasis added) (internal citation omitted). Indeed, Congress's postponing of the effective date of the statute evidences an intent *not* to apply the new regulations until their effective date.[2] Therefore, the court concludes that Section 107 does not apply to conduct that occurred before its effective date, and Bishop's ADA claims relying on discriminatory conduct that

---

**1.** *Landgraf* and *Rivers* referred interchangeably to pre-enactment conduct and conduct that occurred before the effective date of the statute. The Civil Rights Act of 1991, however, became effective immediately upon the date of its enactment. Pub.L. No. 102–166, § 402, 105 Stat. 1071 (1991).

**2.** Nor does the fact that defendants' discriminatory conduct continued beyond the ADA's effective date affect the retroactivity analysis. As the Supreme Court itself has stated:

A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date and to the extent an employer continued to engage in that act or practice, it is liable under that statute. *While recovery may not be permitted for pre-[effective date] acts of discrimi-*

nation, to the extent that this discrimination was perpetuated after [the effective date], liability may be imposed.

*Bazemore v. Friday*, 478 U.S. 385, 395, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986) (emphasis added).

The issue is different where, for example, a defendant engages in a "continuing course of conduct" that extends back beyond the applicable statute of limitations. In such a situation, the defendant may be held liable for acts that occurred outside the statutory period, because the conduct was *always* unlawful. *See, e.g. Miller v. Beneficial Mgt. Corp.*, 977 F.2d 834, 842 (3d Cir.1992) (in an employment discrimination case, "if the alleged discriminatory conduct is a 'continuing violation,' the statute of limitations begins to run on the date of the last occurrence of discrimination."). *Compare N.J.Stat.Ann.* § 2C:1–6c (criminal statute of limitations begins to run when "course of conduct" terminates).

occurred before July 26, 1992, must be dismissed.

■ Any claims arising under Section 1981a before that date must also be dismissed. Section 1981a merely provides a remedy for intentional violations of the ADA, and does not create any substantive rights. *See Raya*, 829 F.Supp. at 1171–72 ("the ADA is the substantive law creating rights and duties; [Section 1981a] merely amends the ADA and provides the remedies.").

Bishop points out that she may, at trial, be entitled to admit pre-ADA instances of discrimination as evidence of defendants' discriminatory intent. *See Hazelwood School Dist. v. United States*, 433 U.S. 299, 309 n. 15, 97 S.Ct. 2736, 2742 n. 15, 53 L.Ed.2d 768 (1977). The admissibility *vel non* of this conduct as evidence is not, however, relevant to whether, under the ADA, Bishop may recover damages for discriminatory acts that occurred before July 26, 1992. *Landgraf, Rivers*, and *Miller v. Florida* instruct that she may not.

### B. Plaintiff's Claims Against the Individual Defendants

Bishop has also brought claims under the ADA against Boyd and Kocher both "individually" and in their "official" capacities. (Complaint ¶¶ 4–5). Boyd and Kocher contend that (1) the ADA does not contemplate suits against supervisory employees of private employers in their "individual" capacities, and (2) these claims are barred because Bishop failed to exhaust her administrative remedies with the Equal Employment Opportunity Commission ("EEOC").

### 1. *"Individual" and "Official" Capacity*

■ Bishop purports to sue Boyd and Kocher in both their "individual" and "official" capacities. In response, Boyd and Kocher argue that a supervisory employee of a private employer may not be held liable in his "individual," as distinguished from his

"official," capacity. We fail to see any distinction between these two roles.

■ Only "employers" may be liable under the ADA. 42 U.S.C. § 12112(a). An "employer" includes "a person engaged in industry affecting commerce who has fifteen or more employees ... and any agent of such person." 42 U.S.C. § 12111(5)(A).[3] Generally, an individual with supervisory authority is considered an "agent" of an employer. *See Doe v. William Shapiro, Esq., P.C.*, 852 F.Supp. 1246, 1251 (E.D.Pa.1994).

■ The ADA, Title VII, and the Age Discrimination in Employment Act ("ADEA") all contain similar definitions of "employer."[4] While the Third Circuit has not addressed the distinction between "individual" and "official" capacities in suits under these statutes, other circuits have held that supervisory employees of *public* employers may only be sued in their official capacity. *See Harvey v. Blake*, 913 F.2d 226, 227–28 (5th Cir.1990); *Sauers v. Salt Lake County*, 1 F.3d 1122 (10th Cir.1993); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991). *See also Verde v. City of Philadelphia*, 862 F.Supp. 1329, 1333 (E.D.Pa.1994). A suit against a supervisory employee in her official capacity is a suit against the individual in name only; it operates in all respects as a suit against the employer. *Sauers*, 1 F.3d at 1125.

More recently, several courts, including two district courts within this circuit, have held that these statutes do not allow suits against supervisory employees of a private employer in their individual capacity. *See Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir.1994); *Grant v. Lone Star Co.*, 21 F.3d 649 (5th Cir.1994); *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583 (9th Cir.1993); *Crawford v. West Jersey Health Systems*, 847 F.Supp. 1232, 1237 (D.N.J.1994); *Violanti v. Emery Worldwide A–CF Co.*, 847 F.Supp. 1251, 1256–57 (M.D.Pa.1994). In *Miller*, the most often cited of these cases,

---

3. Until July 26, 1994, "employer" status required at least 25 employees. *Id.* Okidata, however, has hundreds of employees.

4. *See* 42 U.S.C. § 2000e(b) ("employer" under Title VII "means any person ... who has fifteen or more employees ... and any agent of such a person"); 29 U.S.C. § 630(b) ("employer" under the ADEA "means any person ... who has twenty or more employees ... and any agent of that person").

the Ninth Circuit found that the term "agent" in the definition of "employer" merely incorporated respondeat superior liability into the statute. *Miller*, 991 F.2d at 587. The court reached this conclusion because: (1) before the addition of Section 1981a in 1991, these statutes only allowed relief such as back pay and reinstatement, which one would normally seek only from an employer;[5] and (2) it was incongruous to allow liability to run against individuals while exempting employers with less than the required number of employees. *Id.*

Some district courts, however, have allowed plaintiffs to pursue actions against supervisory employees of private employers in their "individual" capacities. *See Griffith v. Keystone Steel & Wire Co.*, 858 F.Supp. 802 (C.D.Ill.1994), *Vakharia v. Swedish Covenant Hosp.*, 824 F.Supp. 769 (N.D.Ill.1993); *Bridges v. Eastman Kodak Co.*, 800 F.Supp. 1172 (S.D.N.Y.1992). These courts have noted that, under 42 U.S.C. § 1981, decision-making employees of private employers who take discriminatory actions outside of the scope of the employer's institutional policies may be individually liable. *Vakharia*, 842 F.Supp. at 784. Furthermore, these courts note that one of the main reasons for not allowing individual liability under these statutes, the nature of the relief available, has been abrogated by the availability of compensatory and punitive damages under Section 1981a. *Bridges*, 800 F.Supp. at 1180.

A final group of courts has abandoned the "individual"/"official" dichotomy in these cases. *See Hanshaw v. Delaware Technical & Community College*, 405 F.Supp. 292, 296 (D.Del.1975); *Kelly v. Richland School Dist.*, 463 F.Supp. 216, 218 (D.S.C.1978); *Doe v. William Shapiro, Esq., P.C.*, 852 F.Supp. 1246 (E.D.Pa.1994). Most recently, in *Shapiro*, Judge Gawthrop stated that this distinction was "without a basis in the law." 852 F.Supp. at 1253. The distinction was borrowed from cases decided under 42 U.S.C. § 1983, he noted, which requires that one act "under color of state law," a requirement inapplicable under Title VII or the ADA. *Id.* Because supervisory employees are clearly "agents of an employer" and thus "employers" under the statute, they may be sued as any other employer. *Id.*

We agree with Judge Gawthrop's conclusion. The current confusion surrounding "individual" or "official" liability under Title VII results in large part from confusing the issue with the doctrine of qualified immunity of public officials under Section 1983. *See, e.g., Harvey*, 913 F.2d at 228 ("Only when a *public official* is working in an official capacity can that official be said to be an 'agent' of the government") (emphasis added). Furthermore, we find the one circuit court decision addressing this issue unpersuasive. In *Grant*, the Fifth Circuit noted that while supervisory employees fell within the statutory definition of "persons" liable under Section 1983, qualified immunity protected them from individual liability. Although qualified immunity does not apply in Title VII cases, the court further stated, supervisory employees nonetheless are not liable because they do not fall within the statutory definition of "employer." *See Grant*, 21 F.3d at 651–52.

The plain language of the ADA, however, indicates that "agents" of those who employ more than 15 workers are "employers" and thus liable under the statute. Supervisory employees are clearly "agents," and thus the distinction between "individual" and "official" liability should be abandoned in ADA cases.

Although this approach allows individual liability while exempting companies that employ less than 15 workers, we find that the policies underlying the protection of small employers are much different than those underlying individual liability. Small employers are exempted from the ADA because of the undue burden compliance would

---

**5.** *See also Levendos v. Stern Entertainment, Inc.*, 909 F.2d 747, 751 (3d Cir.1990) ("Title VII remedies, such as reinstatement and backpay, generally run against the employer as an entity.") (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 75, 106 S.Ct. 2399, 2409, 91 L.Ed.2d 49 (1986) (Marshall, J., concurring)). *Levendos* did not, however, address whether supervisory employees were individually liable, but rather when their actions could be imputed to the employer. *Id. Levendos* was also decided before the passage of Section 1981a, which made compensatory and punitive damages available to victims of intentional discrimination.

put on their financial condition.[6] Individuals, however, have always been liable for torts committed in the workplace, including indemnification of their employer where the plaintiff proceeds directly against the employer under the theory of respondeat superior. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 51, at 341 (5th ed. 1984). *See also Griffith*, 858 F.Supp. at 805 (" 'Principal and agent can be joined in one action for a wrong resulting from the tortious conduct of the agent . . . and a judgment can be rendered against each.' ") (*quoting Restatement (Second) of Agency* § 359(c)(1) (1957)). Indeed, the traditional theory was that *only* the employee, and not the employer, was liable for intentional torts such as those contemplated by Section 1981a. *Prosser and Keeton on Torts* § 70, at 505.[7] Thus, the court sees no inconsistency in imposing individual liability on supervisory employees of large employers while exempting small employers and their agents.

### 2. *Exhaustion of Administrative Remedies*

■ Because the court has found that Bishop may proceed directly against Boyd and Kocher, we must now decide whether Bishop is precluded from bringing her claim for failure to exhaust available EEOC remedies. Those proceeding with employment discrimination claims under the ADA must follow the administrative procedures set forth in Title VII, 42 U.S.C. § 2000e–5. *See* 42 U.S.C. § 12117. Section 2000e–5 requires an aggrieved party to file, within 180 days of the alleged discriminatory practice, a charge with the EEOC and receive a "right to sue" letter before bringing an action against "the respondent named in the charge." 42 U.S.C. § 2000e–5. Although this procedure is not jurisdictional, a party must exhaust these administrative remedies before suing in federal court. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398, 102 S.Ct. 1127, 1135, 71 L.Ed.2d 234 (1982).

■ In this case, Bishop filed a charge on August 25, 1993, naming Okidata as the sole respondent. EEOC Charge # 170931708 (Plaintiff's Brief at Ex. "A").[8] The charge did not name Boyd and Kocher as respondents, however, and did not mention them in the accompanying statement of facts. Boyd and Kocher contend that because they were not "respondents named in the charge," Bishop has not exhausted her administrative remedies against them.

---

6. Indeed, the practice of exempting small employers *is not unique to discrimination statutes*. *See, e.g.*, 29 U.S.C. § 2101(1) (exempting business enterprises with less than 100 employees from the Worker Adjustment and Retraining Notification Act); 29 C.F.R. § 1910.15 (exempting employers with no more than ten employees from certain reporting requirements promulgated by the Occupational Safety and Health Administration).

7. Some courts have read Section 1981a as evidence that Congress did not intend to hold supervisory employees individually liable, because it limits the liability of each "respondent" for compensatory and punitive damages based on its number of employees. 42 U.S.C. § 1981a(b)(3). In *Miller*, the court found that because "Congress specifically limited the damages available depending upon the size of the respondent *employer*," it could not have intended individual liability under this section. 991 F.2d at 587 n. 2 (emphasis in original). This argument assumes that only employers are "respondents," and thus begs the question. It is just as logical to assume that the statute caps damages against employers of certain sizes and their agents, while exempting smaller employers and their agents.

Other courts have found that a Congress "so solicitous of the vulnerability of small employers

to litigation costs and liability that it exempts them completely from liability" would not "really intend to subject salaried workers to damages of $300,000, just because that particular 'agent' had the misfortune to work for a large employer." *Verde*, 862 F.Supp. at 1333. This argument assumes that liability and litigation costs are the greatest costs of complying with discrimination statutes. We believe that the greatest cost incurred with regard to these statutes, especially a statute such as the ADA that requires employers to make "reasonable accommodations" to disabled employees, 42 U.S.C. § 12112(b)(5)(A), is the cost of compliance. Because compliance costs are larger for larger employers, damages may be capped for the same reasons that small employers are exempt from damages altogether.

8. A court may properly consider undisputedly authentic documents attached to the motion papers of either party in deciding a Rule 12(b)(6) motion to dismiss. *See In re Donald J. Trump Casino Securities Lit.*, 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994).

■ The purpose of requiring resort to EEOC procedures before bringing a private suit is twofold: to give notice to the charged party and to promote voluntary compliance without litigation. *Glus v. G.C. Murphy Co.,* 562 F.2d 880, 888 (3d Cir.1977). In *Glus,* the Third Circuit stated that in determining whether a plaintiff who failed to name a defendant as a party in an EEOC charge could nonetheless bring a private suit against that party, a district court should consider:

1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained by the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.*

■ Additionally, the court may consider whether the factual statements of the charge puts the unnamed defendant on notice of her alleged role in the discrimination. *Pittman v. LaFontaine,* 756 F.Supp. 834, 847 (D.N.J.1991). None of these factors is independently decisive, but as a whole they must be considered in light of the purposes of the administrative procedure and the interests of the parties. *Glus v. G.C. Murphy Co.,* 629 F.2d 248, 251 (3d Cir.1980), *vacated on other grounds sub nom. Retail, Wholesale and Department Store Union, AFL–CIO v. G.C. Murphy,* 451 U.S. 935, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981).

We note that the first and fourth *Glus* factors weigh against Bishop. She clearly knew of Boyd's and Kocher's involvement in the alleged discriminatory acts, and failed to name them as respondents. Furthermore, Boyd and Kocher in no way represented that Bishop was to conduct her relationship with them through Okidata. *See Borecki v. East-*

*ern Int'l Mgt. Corp.,* 694 F.Supp. 47, 53 (D.N.J.1988).

The second factor, however, weighs in favor of Bishop. Boyd and Kocher, as supervisory employees of Okidata, have interests very similar to Okidata. *See Acampora v. Boise Cascade Corp.,* 635 F.Supp. 66, 71 (D.N.J.1986).

The third factor, actual prejudice, and the inquiry into whether the EEOC charge put Boyd and Kocher on notice prevent us from dismissing Bishop's claim at this time. Bishop did not name Boyd and Kocher as respondents or the accompanying statement of facts. *Compare Acampora,* 635 F.Supp. at 71 (D.N.J.1986) (naming individual defendant in accompanying statement of facts gives notice to defendant and thus fulfills purpose of administrative proceeding). Bishop did, however, name both Boyd and Kocher in an affidavit accompanying her EEOC charge, and she claims that this gave them adequate notice of her complaint.

One court in this district has agreed with Bishop's position. In *Cook v. Applied Data Research,* Civ. No. 88–2894, 1989 WL 85068 (D.N.J. July 20, 1989), the court held that naming individual defendants in an accompanying affidavit gave them adequate notice, and thus adequately exhausted plaintiff's administrative remedies. *Id.* at *6.

■ We cannot agree that naming individual defendants in the affidavit accompanying the EEOC charge always constitutes exhaustion of administrative remedies. The affidavit clearly states that the EEOC will keep it in confidence during the course of the investigation. (*See* Plaintiff's Brief at Ex. "A"). Thus, while it may help the EEOC in determining the proper scope of its investigation, *see Cook,* 1989 WL 85068, at *6, it does not give actual notice to the *defendants,* the purpose we must consider under *Glus.* Thus, merely naming an individual defendant in an affidavit accompanying an EEOC charge is not by itself adequate notice.

The court will not, however, grant Boyd and Kocher's motion to dismiss at this time. Whether Boyd and Kocher had actual notice of the complaint or suffered actual prejudice is a fact-based inquiry that must be resolved

in discovery. Relevant inquiries include whether Boyd and Kocher knew of Bishop's EEOC complaint, played a role in Okidata's response, or influenced Okidata's course of action. *See Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1141 (E.D.Pa.1990) (Pollak, J.) (participation of unnamed defendants in EEOC investigation precludes dismissal of claim against them for failure to exhaust administrative remedies).[9] Therefore, the motion to dismiss for failure to exhaust administrative remedies is denied.

### C. Breach of Contract Claim

■ Count Three of Bishop's complaint alleges that, under New Jersey law, defendants breached a covenant of good faith and fair dealing in Bishop's employment contract. Defendants ask us to dismiss this claim because Bishop was an employee at will, and thus no covenant of good faith and fair dealing applies.

Bishop does not allege that she had any employment contract, and admits that she was an employee at will. *See Bernard v. IMI Systems, Inc.,* 131 N.J. 91, 97, 618 A.2d 338 (1993). She nonetheless argues that her at-will employment relationship with Okidata gave rise to a covenant of good faith and fair dealing.

■ The essential element of this dispute, however, is not whether Bishop was an employee at will, but what *contractual terms* governed Bishop's employment relationship with Okidata. An "at-will" employee is merely one who may be fired at any time, for any reason, by her employer. *See Bernard,* 131 N.J. at 105, 618 A.2d 338. An at-will employment relationship may contain contractual terms governing issues other than the duration of the relationship. *See Nolan v. Control Data Corp.,* 243 N.J.Super. 420, 579 A.2d 1252 (App.Div.1990). An implied covenant of good faith attaches to those enumerated terms, "regardless of whether that

relationship is characterized generally as being 'at will.'" 243 N.J.Super. at 429, 579 A.2d 1252.

■ There is no implied covenant of good faith and fair dealing, however, in those portions of an at will employment relationship that are not governed by contractual terms. As New Jersey courts have repeatedly stated: "In the absence of a contract, there is no implied covenant of good faith and fair dealing." *Nolan,* 243 N.J.Super. at 429, 579 A.2d 1252 (*quoting Noye v. Hoffmann–La Roche Inc.,* 238 N.J.Super. 430, 434, 570 A.2d 12 (App.Div.), *certif. denied,* 122 N.J. 146, 584 A.2d 218 (1990)).

For example, in *McQuitty v. General Dynamics Corp.,* 204 N.J.Super. 514, 499 A.2d 526 (App.Div.1985), the plaintiff's union had worked under a collective bargaining agreement that included a right to be fired only for just cause. 204 N.J.Super. at 516–17, 499 A.2d 526. The collective bargaining agreement expired, however, and the union returned to work without condition. *Id.* at 518, 499 A.2d 526. When the plaintiff was fired, he alleged, *inter alia,* that the defendant employer had breached an implied covenant of good faith toward him. *Id.* The court held:

> Since plaintiff was working without a contract as an at-will employee, his argument that every contract imposes a duty of good faith and fair dealing is irrelevant. One cannot read additional terms into a nonexistent contract. Defendant had an absolute right to terminate plaintiff without cause.

204 N.J.Super. at 520, 499 A.2d 526.

Thus, we find that Bishop's allegation that defendants breached an implied covenant of good faith and fair dealing toward her may properly be dismissed for failure to state a claim. *See Obendorfer v. Gitano Group, Inc.,* 838 F.Supp. 950 (D.N.J.1993) (dismiss-

---

9. Indeed, while defendants believe that *Borecki v. Eastern Int'l Mgt. Corp.,* 694 F.Supp. 47, 53 (D.N.J.1988), supports their argument, that case suggests that the court should not dismiss the claim at this stage. In *Borecki,* the court granted an individual defendant summary judgment because of plaintiff's failure to exhaust administrative remedies. 694 F.Supp. at 53–56. The court

found that, based on the record, including the fact that the former employee was incarcerated at the time the EEOC charge was filed, the defendant had not received actual notice of the charge. *Id.* at 54. In the case at bar, however, the court does not yet have a record to examine in making this determination. Therefore, a decision at this stage would be premature.

ing an identical allegation for failure to state a claim under New Jersey law). Count Three of Bishop's complaint is dismissed in its entirety.

### D. Intentional Infliction of Emotional Distress

Count Four of Bishop's complaint alleges that defendants have "knowingly and intentionally undertaken a course of conduct respecting plaintiff designed to embarrass, humiliate, and denigrate plaintiff," (Complaint, ¶ 51), and requests damages for the intentional infliction of emotional distress. Defendants ask us to dismiss this count for failure to state a claim under New Jersey law.

New Jersey has adopted the *Restatement (Second) of Torts* definition of intentional infliction of emotional distress. *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 365–66, 544 A.2d 857 (1988). The Restatement defines the tort of intentional infliction of emotional distress as "extreme and outrageous conduct [that] intentionally or recklessly causes severe emotional distress to another." *Restatement (Second) of Torts* § 46(1) (1965).

At issue here is whether Defendants' conduct was so "extreme and outrageous" as to allow Bishop to recover. To recover, Bishop must prove conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley*, 111 N.J. at 366, 544 A.2d 857 (*quoting Restatement (Second) of Torts* § 46 cmt. d). It is for the court to determine whether the plaintiff has alleged sufficiently

extreme and outrageous conduct to allow a jury to grant her recovery. *Id.* at 367, 544 A.2d 857. If she has not, the claim may be dismissed. *See Obendorfer v. Gitano Group, Inc.*, 838 F.Supp. 950, 955 (D.N.J.1993).

Although it is uncontested that New Jersey law applies to this matter, the parties have cited both New Jersey and Pennsylvania authorities discussing the intentional infliction of emotional distress. Pennsylvania has also adopted the Restatement definition of this tort. *See Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988). Because the New Jersey and Pennsylvania decisions are largely parallel, *see Cautilli v. GAF Corp.*, 531 F.Supp. 71, 72–73 (E.D.Pa.1982), we will assume that the law of the jurisdictions is the same.

At the outset, we note that "the limited scope of the tort tolerates many kinds of unjust, unfair and unkind conduct." *Fregara v. Jet Aviation Business Jets*, 764 F.Supp. 940, 956 (D.N.J.1991) (*quoting Cautilli*, 531 F.Supp. at 74). This is especially true in the employment context. Indeed, courts have found that "it is extremely rare to find conduct in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery." *Id.* (*quoting Cox*, 861 F.2d at 395).[10]

For example, in *Cox*, the plaintiff had returned to work on a part-time, trial basis following triple-bypass surgery. The defendant terminated the plaintiff on the first day of his return. 861 F.2d at 391. The court found that the defendant knew that the plaintiff had undergone triple bypass surgery, knew his emotional and physical recuperation were incomplete, knew it was endangering

---

**10.** Another obstacle facing plaintiffs who bring intentional infliction of emotional distress claims arising out of an employment relationship is the tort bar of the relevant workman's compensation statute. In some states, the workman's compensation statute provides the sole remedy of the employee against the employer, regardless of whether the tort was intentional. *See, e.g.*, 77 P.S. § 481(a); *Poyser v. Newman & Co.*, 514 Pa. 32, 522 A.2d 548 (1987); *Shapiro*, 852 F.Supp. at 1253; *Kinnally*, 748 F.Supp. at 1143–44. The New Jersey tort bar, however, contains an exception for "intentional wrongs." *N.J.S.A.* § 34:15-8. To recover for an "intentional wrong," a plaintiff must show an "actual intent" or "sub-

jective desire" to injure. *Millison v. E.I. du Pont Nemours & Co.*, 101 N.J. 161, 170–73, 501 A.2d 505 (1985).

A plaintiff who could meet the heavy burden of proving the intentional infliction of emotional distress in the workplace might also prove a case that fits within the "intentional wrong" exception to the tort bar. Whether the tort bar would preclude a workplace-related intentional infliction of emotional distress claim where the employer "acts recklessly in deliberate disregard of a high probability that emotional distress will follow," *Buckley*, 111 N.J. at 366, 544 A.2d 857, is a question we need not resolve at this time.

the plaintiff's medical and disability benefits, and knew it was depriving him of a valuable therapeutic tool and jeopardizing his chances to obtain alternate employment. *Id.*

Despite this, the court held the defendant "can only be said to have dismissed Cox with an improper motive and notwithstanding the potential effects on Cox." *Id.* at 396. This conduct did "not appear to arise to the level of outrageousness" required. *Id.* Thus, the court concluded that "Keystone's behavior was not so outrageous as to allow a reasonable jury to afford Cox relief on his intentional infliction of emotional distress claim." *Id.*

■ While the court is skeptical of Bishop's ability to meet the extremely high standard for an employment-related intentional infliction of emotional distress claim, it will not dismiss the claim at this time. Bishop alleges a litany of facts that could support a claim of intentional infliction of emotional distress. Among them are allegations that Defendants refused to promote her; made false accusations against her and threatened her with discharge; excluded her from training programs; forced her to return to work two weeks after her cancer surgery, in contravention to her doctor's orders; and refused to allow her to leave work for needed radiation and chemotherapy treatments. While many of these actions are no more extreme and outrageous than conduct other courts have found inadequate to support an intentional infliction of emotional distress claim,[11] others are not. Furthermore, Bish-

op has alleged a continuing pattern of harassment, which several courts have found adequate to survive a motion to dismiss. *See Porta v. Rollins Environmental Services, Inc.,* 654 F.Supp. 1275, 1285 (D.N.J.1987); *Cory v. SmithKline Beckman Corp.,* 585 F.Supp. 871, 875 (E.D.Pa.1984). *But see Cox,* 861 F.2d at 395 ("the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee.").

The intentional infliction of emotional distress tort is fact-intensive, and discovery in this case will proceed regardless of the disposition of this claim. The court believes that a more educated disposition of this claim can be made when more facts are known, such as at summary judgment or the close of the plaintiff's case. For example, under New Jersey law other important inquiries include whether defendants acted intentionally, whether their acts proximately caused Bishop's emotional distress, and whether Bishop's emotional distress was severe. *See Buckley,* 111 N.J. at 366–67, 544 A.2d 857. Because the court cannot resolve inquiries such as this on the pleadings, the motion to dismiss this claim is denied.[12]

## IV. CONCLUSION

Counts One and Two of Bishop's complaint, alleging violations of the ADA and Section 1981a, are dismissed to the extent

---

11. *See, e.g., Brunner v. Abex Corp.,* 661 F.Supp. 1351, 1353 (D.N.J.1986) (termination of employee while she was moving into a new house she had bought in order to accommodate relocation by her employer); *Aquino v. Sommer Maid Creamery, Inc.,* 657 F.Supp. 208, 211 (E.D.Pa. 1987) (harassment, beratement and oversupervision of female employee, along with instance where male supervisor followed her into women's bathroom); *Fregara v. Jet Aviation Business Jets,* 764 F.Supp. 940, 956 (D.N.J.1991) (plaintiff was threatened with discharge, asked to resign, overworked, required to attend counselling sessions dealing with his performance, told he was not doing a good job, given warning notices, and closely monitored).

12. In its Reply Brief, defendants also argue that the two-year New Jersey statute of limitations for injuries to person, *N.J.S.A.* § 2A:14–2, precludes much of Bishop' intentional infliction of emo-

tional distress claim. (Defendants' Reply Brief at 13). New Jersey courts have not decided the appropriate statute of limitations for intentional infliction of emotional distress claims, however, and a recent New Jersey Supreme Court opinion casts doubt on the appropriate limitations period for employment-related claims. *See Montells v. Haynes,* 133 N.J. 282, 295, 627 A.2d 654 (1993) (holding that while the two year personal injury statute of limitations is proper for claims under the New Jersey Law Against Discrimination, *N.J.S.A.* § 10:5–13, the decision would be applied prospectively only, and thus claims arising before July 27, 1993, are governed by the six-year general statute of limitations, *N.J.S.A.* § 2A:14–1). Furthermore, this tort may be governed by the "continuing course of conduct" doctrine. *See supra,* at n. 2. Because this issue will benefit from further briefing and discovery, the court will not resolve it at this time.

that they arise out of actions occurring before July 26, 1992. Defendants' motion to dismiss all remaining claims against Boyd and Kocher under these counts is denied. Count Three, alleging breach of an implied warranty of good faith and fair dealing under New Jersey law, is dismissed in its entirety. Defendants' motion to dismiss Count Four, alleging intentional infliction of emotional distress, is denied.