**Richard HORVATH and Judith Horvath, Plaintiffs,**

v.

**RIMTEC CORPORATION, Teruhisa Koeda, Ray Johnston, Sr. and Daniel Preston, Defendants.**

No. CIV.A. 99–670(JEI).

United States District Court, D. New Jersey.

June 27, 2000.

**222**

Samantha A. Millrod, Frank & Rosen, Cherry Hill, NJ, for Plaintiffs.

Bruce L. Harrison, Capeheart & Scatchard, Mount Laurel, NJ, for Defendants.

**OPINION**

IRENAS, District Judge.

Defendants' Rimtec Corporation ("Rimtec" or "Company"), Teruhisa Koeda and Ray Johnston, Sr., move for partial summary judgment on plaintiffs' claims alleging age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 *et seq.* ("NJLAD"), and their claims of negligent and intentional infliction of emotional distress, malicious interference with existing employment relations or prospective economic advantage and loss of consortium.[1] For the reasons set forth below, defendants' motion for summary judgment is granted in part and denied in part.

**I.**

Fifty-four year old plaintiff Richard Horvath,[2] commenced employment with defendant Rimtec, a plastics manufacturer, in or around April, 1969, and has been employed by Rimtec and its predecessor continuously for 31 years. During his tenure as an employee for Rimtec and its predecessor, plaintiff has worked as a Laborer, Production Line Worker, Quality Control Mechanic, General Foreman, Production Supervisor and Pilot Line Operator. Between 1989 and 1993, plaintiff was promoted twice, first in 1989 to Production Supervisor and in 1991 to General Foreman. He currently works in the position of Utility Coordinator.

In 1993, due to financial difficulties, the Company was forced to restructure. (R. Horvath dep. at 23–24; Johnston dep. at 79–80.) The General Foreman position was eliminated and plaintiff was moved back to his former position of day shift Production Supervisor. (*Id.*) Plaintiff's salary and benefits were not affected by the position change. (*Id.* at 77.) At the same time, Gary Woods, (in his 30's at the

---

1. The remaining defendant in this case, Daniel Preston, has not joined in this motion.

2. Throughout this opinion, the Court will refer to Richard Horvath as "plaintiff" and to Mrs. Horvath as "Mrs. Horvath." Collectively, they will be referred to as "plaintiffs."

time) was moved into the position of Color Matcher and Richard Grzybowski (in his 30's at the time) was moved into the position of night shift Production Supervisor. (*Id.* at 25.) According to Grzybowski, Mr. Horvath trained both him and Mr. Woods over many years. (Grzybowski dep. at 31.) Plaintiff remained in the position of day shift Production Supervisor until May, 1996.

■ On August 30, 1995, Rimtec held a managerial meeting that was attended by nine supervisory employees and a Mr. Asami, an employee of Mitsubishi, Rimtec's co-owner at the time. (Eckman dep. at 26–33.) As was the common practice in meetings since 1992, Roger Eckman, Sr. took the minutes and prepared a memorandum ("Memo") entitled "Manager Meeting" which was later distributed to attendees and eventually circulated among Rimtec's employees. (*Id.* at 26–42.; Grzybowski dep. at 28–30; Pl.Ex. F.) Mr. Eckman testified that he typed this Memo immediately after the meeting because his supervisor, Mr. Tokiwa, wanted to use the notes at a meeting later that day with the president and vice-president of the Company. (*Id.*) Under the subheading "Education," the Memo stated: "Managers must keep their qualifications up or they can be replaced by a *younger* person." (emphasis in the original). (Pl.Ex. F.) Mr.

Eckman testified that Mr. Asami made this statement. (Eckman dep. at 37–39.) Also in this Memo, under the subheading "Safety & Environment," the Memo states: "Due to personnel cutbacks the age of operators makes it harder to do clean-ups." (Pl.Ex. F.) He also testified that on the same day as the meeting, he distributed the Memo to the meetings' attendees. (Eckman dep. at 42–43.) In addition, he stated that although no one at the meeting told him not to put the word "younger" in the minutes, a few days later defendant Johnston told him that he should not have put the word "younger" in the minutes and asked him to take it out. (*Id.* at 43–48.) In fact, Eckman testified that defendant Johnston instructed him to delete the word "younger" from the Memo, to get the Memo back from anyone who received it already, and to redistribute a copy of the revised minutes changing the word "younger" to "more educated" ("Revised Memo"). (*Id.* at 47; Pl.Ex. H.) The Revised Memo was distributed one week after the original meeting date. (Pl.Ex. H.) Eckman also testified that Richard Merkell, a Vice President at Rimtec, told him that the Memo could create a lawsuit. (*Id.* at 51.) [3]

In 1996, because plaintiff's supervisor was demoted to day shift Production Supervisor, he was forced into the midnight

---

**3.** Whether this Memo or any statements made by Mr. Asami should be allowed into evidence was before the Court in the form of a Motion in Limine brought by defendants in March, 2000. On March 13, 2000, this Court determined that defendants Motion was premature and should be considered either immediately prior to the commencement of trial or during trial. However, because the resolution of this issue is pertinent to defendants current Motion, the Court will address it in this Opinion.

Defendants argue that Mr. Asami's statement/Memo should not be considered by the Court because it is inadmissible double hearsay under Federal Rules of Evidence 801(d)(2) and 805. They also contend that if relevant, the statement/Memo should be barred as more prejudicial than probative under F.R.E. 403. In response, plaintiff argues that the Memo is a memorandum kept in the course of regularly conducted business activity, made at the time of the August 30, 1995

meeting and it meets the F.R.E. 803 hearsay exception. Plaintiff also asserts that the statements/Memo is non-hearsay because pursuant to F.R.E. 801(d)(2)(A), it is an admission by a party opponent or under F.R.E. 801(d)(2), it is a statement by a party agent, Mr. Eckman, concerning a matter within the scope of the agency or employment, made during the existence of the relationship. In addition, plaintiff claims that the Memo is not being offered for the truth of the matter asserted, but is being offered to show Rimtec's corporate atmosphere and the Company's state of mind on the issue of age and productivity.

Under the Federal Rules of Evidence, "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). The statement made by Mr. Asami in the managerial meeting which was

shift Production Supervisor position. (Horvath dep. at 30.) Due to these changes, Woods, who was trained by Horvath and had less experience and seniority, was promoted to the position of Production Manager and became Horvath's supervisor. (*Id.* at 28.) In addition, Grzybowski, also trained by Horvath and with less experience and seniority, was promoted to the position of Safety Manager. (*Id.* at 32.) Because he was dealing with family issues that required him to work during the day, on September 17, 1996, plaintiff wrote to Plant Manager, Raymond Johnston, Jr. and proposed a new position for himself, titled "Plant Cleanliness Coordinator/Supervisor." (Def. reply brief, Ex. B.) He wrote: "I would like to propose the attached job description. This position would benefit the Company and me in the position, even though I realize it would be a substantial pay cut for me." (*Id.*) According to plaintiff's description, as Plant Cleanliess Coordinator/Supervisor, he would work the day shift between the hours of 7–3. (*Id.*) In and around October 1996, plaintiff also spoke with Woods and requested that he be moved back to the

day shift; he proposed to Woods that Raymond Johnston, Jr. take the midnight shift and that he could be moved to the Traffic Manager position. (*Id.* at 68, 73, 151.)

Johnston rejected plaintiff's proposal but offered him the lower paying position of Pilot Line Operator. (Johnston dep. at 89.) In an October 28, 1996, memorandum defendant Johnston wrote to Vice President Hiro Shimizu:

> Due to problems with R. Horvath's parents being sick and requiring his time, it has been difficult for him to work the 11–7 shift, and he has not been able to get the proper amount of rest. Mr. Horvath has asked if there is a possibility of being moved to a 7–3 position. I have discussed with Mr. Merkel the possibility of moving Mr. Horvath to the pilot line position on 7–3 shift at $35,000.00 per year. Mr. Merkel has agreed to this, .... Mr. Horvath has agreed to $35,000 per year. He will be retiring in approximately two years.

(Def. Reply Ex. C.)

Plaintiff testified that he accepted the lower paying position of Pilot Line Opera-

later distributed as a Company memorandum would be considered inadmissible hearsay as it is being offered to prove the truth of the matter asserted, that Rimtec was out to get its older employees. However, plaintiff is correct that the statement is a non-hearsay party admission under F.R.E. 801(d)(2), which makes a statement non-hearsay if it is an "[a]dmission by a party opponent." The "party opponent" here is Rimtec. While the discriminatory statement was made by Mr. Asami, a consultant and not a decisionmaker at Rimtec, it was adopted by the Company when it was recorded, distributed to Rimtec's managers and used in a meeting with Company executives. Furthermore, Rimtec only chose to change the language in the Memo one week after the statement was made, following comments by a vice-president that the Memo could cause a lawsuit.

Pursuant to F.R.E. 801(d)(2)(B), a court can allow into evidence adoptive admissions as non-hearsay if "[t]he statement is offered against a party and is ... a statement of which the party has manifested an adoption or belief in its truth." As the Sixth Circuit has explained, "Adoption can be manifested by any appropriate means, such as language,

conduct, or silence.... If the statements are viewed as the defendant's own, they constitute admissions properly characterized as non-hearsay under Fed.R.Evid. 801(d)(2)." *Neuman v. Rivers*, 125 F.3d 315, 320 (6th Cir.1997). Because the Court finds that Rimtec adopted Mr. Asami's statement as an admission, defendants' argument that the statement is a "stray remark" unrelated to Rimtec's decisionmaking process and should be given little weight, is inappropriate. Furthermore, even prior to the Court's finding that Rimtec adopted the statement, such a "stray remark" would constitute circumstantial evidence "critical for the jury's assessment of [the] employer was more likely than not to have acted from an unlawful motive." *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 521 (3d Cir.1997); *see also Brewer v. Quaker State Oil Refining*, 72 F.3d 326, 333 (3d Cir.1995) (holding that at trial, a stray remark by non-decisionmaker about the employer's managerial policy is relevant to show corporate culture .in which company makes its employment decisions). Therefore, Asami's statement/Memo can be attributed to Rimtec as an admission and will be admitted as non-hearsay.

tor because his family problems required that he have a day job. (Horvath dep. at 20.) Also, while plaintiff does not dispute that he told Mr. Johnston in October of 1996, that he might be retiring within two years, he testified that he "never pursued retirement formally," that "the retirement thing, it was a dream" and that "after [he] went on the pilot line, the memos and the correspondence that [he] had with Jeff Nash and Mr. Koeda, it should have been quite obvious that I had no intentions of retiring." (*Id.* at 72–75.) Plaintiff remained in the Pilot Line position until January of 1998. However, plaintiff testified that when the day shift Traffic Manager position became available in and around October of 1997, Raymond Johnston, Jr., who was much younger and less experienced, received the position. (*Id.* at vol. 2 at 203.)

According to plaintiff, Woods told him that he was never considered for the Traffic Manager position because defendant Johnston had made the decision. (*Id.* at 203; Grzybowski dep. at 34.) He also alleges that he complained to Jeffrey Nash, his immediate supervisor, about losing promotions to younger people and about returning to a job in production. (*Id.* at 33.) He alleges that Nash assured him that he would get back into production and that he would get his old salary back. (*Id.* at 33, 83.)

In 1998, Horvath accepted the newly created Utility Coordinator position. Plaintiff maintains that although he was involved in meetings and discussions with upper level Rimtec management about this position, including defendants Koeda and Johnston, the actual position turned out to be different from the job description. (*Id.* at vol. 2 at 168–172.) In addition, the Utility Coordinator position paid approximately $20,000 less than plaintiff was making in 1993–1996 as General Foreman and Production Supervisor. Also in 1998, plaintiff alleges that other positions became available for which he was not considered.

Plaintiff submitted a "formal notice of complaint" to his supervisor and upper level management in August 1998 about not being considered or interviewed for the various positions that had become available. (Pl.Ex. L.) Plaintiff never received a response to his letter. Although Woods and Eckman both testified that plaintiff was qualified to be a Color Matcher, he was never considered for this position. (Woods dep. at 48; Eckman dep. at 58.) Defendant Johnston testified that at the time the General Foreman position was eliminated, he promised plaintiff that if the position was recreated, he would be re-promoted to it. (Johnston dep. at 79.) However, when the position was recreated, (although Johnston admitted that plaintiff could technically handle the position), he was not given the opportunity to interview for the position because of his alleged retirement plans. (*Id.* at 80–81.) In contrast, defendant Koeda testified that plaintiff was not given the recreated General Foreman position because of his lack of technical ability. (Koeda dep. at 102–03.)

In spite of Johnston's promise, the recreated General Foreman position was given to Grzybowski and later to Johnston, Jr. (Johnston dep. at 88; Woods dep. at 75.) Grzybowski testified that he believed plaintiff was more qualified than he was for the position of Production Manager, which is superior to the General Foreman position. (Grzybowski dep. at 17–18.) In addition, plaintiff cites to the Safety Manager position that became available in June 1998 and was given to Joseph Gormley, (age 25 at the time) who was hired from outside the plant and to Grzybowski's promotion to the position of Production Manager in July 1998. Plaintiff contends that these are examples of positions that he was qualified for but for which he was not considered.

Moreover, Kenneth Russell, a former Rimtec supervisory employee, testified that after thirty-six years with Rimtec and its predecessor, he was demoted from Production Manager to Shift Supervisor.

Gary Woods (in his mid–30s) replaced Russell, as Production Manager. (Russell dep. at 45.) Mr. Russell also testified that he witnessed a pattern at Rimtec, wherein the Company was replacing older employees with younger employees. (*Id.* at 58–60.) In addition, Roger Eckman testified that older employees such as "Kenny Russell, Dick Merrell, [and] Gil Wichard" were "replaced by younger employees." (Eckman dep. at 57.)

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 27, 1998, alleging that he was discriminated against based on his age. (Pl.Ex. K.) He described various positions that were filled by employees aged forty (40) and below. (*Id.*) Specifically, he alleged that during 1998, the positions of Traffic Manager, General Foreman and Production Manager became available, and although he was qualified for each of these positions, Rimtec gave the jobs to younger, less qualified individuals.[4] (*Id.*) On December 10, 1999, the EEOC sent plaintiff a letter informing him that they were "administratively dismissing this charge and terminating all processing." (Pl.Ex. O.) The EEOC's letter further explained that a "private ADEA lawsuit may be filed any time from 60 days after a charge is filed with EEOC until 90 days after receipt of notification that EEOC has terminated its processing of this charge." (*Id.*)

Since filing his Charge with the EEOC, plaintiff received his 1999 annual evaluation from Grzybowski which rated his work performance as "satisfactory" in every way, except in the category "Work Ethic and Attitude," Grzybowski rated him as "need[ing] improvement." (Pl.Ex. M.) Although Grzybowski testified that plaintiff's evaluation was "as good or better than most," plaintiff was not given a raise in January 1999 when other employees received their raises. (Johnston dep. at 57–58.) In fact, plaintiff points out that Nick Evert (over age 40), also was not given a raise, while William Evert (under age 40), who received a less favorable evaluation compared to his, was given a raise. (Pl. Ex. N.) After realizing that plaintiff did not receive a raise, Grzybowski went to Johnston "to fight" to get plaintiff a raise.[5] (Grzybowski dep. at 31; Johnston dep. at 59.) Both Woods and Grzybowski testified that they felt like they were "hitting a brick wall" when they made efforts to get plaintiff back into production and to the day shift Production Supervisor position. (*Id.* at 36; Woods dep. at 71.)

On February 16, 1999, plaintiff and his wife Judith Horvath filed the instant action against Rimtec, Teruhisa Koeda, the former President of Rimtec, Raymond Johnston, Sr., the current Plant Manager of Rimtec, and Daniel Preston, the former Production and Maintenance Executive of Rimtec. Plaintiff asserts claims of discrimination under the ADEA and the NJLAD and claims alleging intentional infliction of emotional distress, negligent infliction of emotional distress and malicious interference with existing employment relations or prospective economic advantage. In addition, Mrs. Horvath brings a claim

4. In his Charge of Discrimination, plaintiff stated:

> During the end of June 1998, the following positions became available; Traffic Manager, General Foreman, and Production Manager. I have worked with the company since 1969, and have more than enough experience to be qualified for any of the positions. I later learned that the following individuals were given the positions; Gary Woods (early 30s) was given the Traffic Manager position, Ray Johnston, Jr. (early 30s) was given the General Foreman position, and Rich Gryzbruski [sic](early 30s) was given the Production Manager position. I have more seniority and experience than all of the selected individuals.... To further substantiate my claims of age discrimination, I have a copy of a Managerial Memo which clearly states that preferential treatment will be given to younger individuals under certain circumstances.

(Pl.Ex. K.)

5. In February, 1999, following an executive meeting, plaintiff was given a raise which was applied retroactively.

for loss of consortium. On April 4, 2000, defendants Rimtec, Koeda and Johnston, Sr. filed the instant Motion for Partial Summary Judgment.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Individual Liability

Defendants argue that because claims under the ADEA and the NJLAD cannot be asserted against individual defendants, plaintiff's claims against defendants Koeda and Johnston must fail as a matter of law. Plaintiff argues that unlike Title VII, both statutes do impose individual liability.

The ADEA makes it unlawful for an employer to discriminate against an employee on the basis of age. 29 U.S.C. § 623(a). The ADEA defines the term "employer" as a person who is "engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar...." 29 U.S.C. § 630(b). "Employer" also includes "any agent of such a person...." *Id.* Plaintiff maintains that his ADEA claims against

defendants Koeda and Johnston should not be dismissed because of this Court's holding in *Bishop v. Okidata*, 864 F.Supp. 416, 423 (D.N.J.1994), that the American with Disabilities Act's ("ADA") inclusion of an employer's "agent" in its definition of "employer" shows that Congress intended to allow claims against individuals in a supervisory capacity.

Although the Third Circuit has not explicitly discussed individual liability under the ADEA, since this Court decided the *Bishop* case, the Third Circuit has stated:

> In the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose-to prohibit discrimination in employment against certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well. Indeed, we routinely use Title VII and ADEA caselaw interchangeably, when there is no material difference in the question being addressed.

*Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 157 (3d Cir.1995). The Third Circuit has also made clear that employees may not be held individually liable under Title VII. *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1078 (3d Cir.1996) (en banc), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997) ("Congress did not intend to hold individual employees liable under Title VII"). In addition, other Circuits and numerous district courts within this Circuit that have directly addressed the issue of individual liability under the ADEA, have ruled that like Title VII, employees may not be held individually liable under the ADEA. *See, e.g., Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir.1996); *U.S. EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276 (7th Cir. 1995); *Smith v. Lomax*, 45 F.3d 402, 403 n. 4 (11th Cir.1995); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510–11 (4th Cir.1994); *Miller v. Maxwell's Int'l Inc.*,

228

991 F.2d 583, 587–88 (9th Cir.1993); *Cohen v. Temple Physicians,* 11 F.Supp.2d 733, 736 (E.D.Pa.1998); *DeJoy v. Comcast Cable Comm., Inc.,* 941 F.Supp. 468, 474–75 (D.N.J.1996). Because the statutory schemes of Title VII and the ADEA are virtually identical, the Court holds that if faced with the issue, the Third Circuit would rule that the ADEA precludes personal capacity suits against individuals. Thus, the individual claims brought under the ADEA against defendants Koeda and Johnston must be dismissed.

Defendants also contend that plaintiff's claim under the NJLAD against defendant Koeda should fail as a matter of law because he did not affirmatively engage in discriminatory conduct. Plaintiff responds that his claim against Koeda under the NJLAD should survive because as President of Rimtec, Koeda was a supervisory employee with direct involvement in his promotions, demotions and salary.

■ In *Tyson v. CIGNA Corp.,* 918 F.Supp. 836 (D.N.J.1996), *modified, Failla v. City of Passaic,* 146 F.3d 149, 155–59 (3d Cir.1998), this Court undertook an extensive analysis of the extent to which individual liability is imposed under the NJLAD. The Court held that N.J.S.A. 10:5–12(a) which deals with employment discrimination, imposes liability only on "employers" and not on individual employ-

ees. *Id.* at 840. The Court went on to say that the only way for an employee to be found individually liable under the NJLAD is if he is involved in aiding or abetting an employer's discriminatory conduct pursuant to N.J.S.A. 10:5–12(e).[6] *Id.* at 837–41 ("The only basis for employee liability [under the NJLAD] is found in N.J.S.A.(e)"); *see* N.J.S.A. 10:5–12(e) (it is "an unlawful employment practice, or . . . unlawful discrimination . . . [f]or any person, whether an employer or an employee or not, to aid or abet . . . the doing any of the acts forbidden under this act, or to attempt to do so."). Accordingly, while an employee cannot be held individually liable on his own, "[e]mployers and individual supervisors can be held liable under the [NJLAD] for aiding and abetting another's [ ] discriminatory conduct." *Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 126 (3d Cir.1999).

Koeda contends that because he was "not a decisionmaker vis-a-vis the plaintiff's terms and conditions of employment . . . [he] can not be held individually liable under the NJLAD." (Def. brief at 24.) Defendants cite to Koeda's deposition where he stated that defendant Johnston was responsible for all decisions related to plaintiff's positions. (Koeda dep. at 13, 24–26, 29.) Plaintiff argues that a jury could find that as the president of Rimtec,

6. To define aiding and abetting under the NJLAD, the Court is *Tyson* cited to the New Jersey Superior Court decision in *Baliko v. Stecker,* 275 N.J.Super. 182, 645 A.2d 1218 (1994) for the proposition that aiding and abetting under the NJLAD is similar to accomplice liability in the criminal context. 918 F.Supp. at 840. The Court held that "[t]he aider and abettor must share the same intent as the one who actually committed the offense." *Id.* (internal quotations omitted). Based on the necessity of shared intent, the Court reasoned that "a supervisor who engages in discriminatory conduct while acting within the scope of his employment shares the intent and purpose of the employer . . . and may be held individually liable . . . for aiding and abetting the employer's unlawful conduct." *Id.* at 841. In *Failla,* 146 F.3d at 156–59, the Third Circuit modified *Tyson*'s analysis of supervisory liability based on aid-

ing and abetting under the NJLAD and held that the "issue of shared intent is irrelevant" and that the "New Jersey Supreme Court would follow the Restatement of Torts [the civil definition of aiding and abetting] to define aiding and abetting under the LAD." *Id.* at 157–58. The *Failla* Court predicted that the New Jersey Supreme Court would hold that "an employee aids and abets a violation of the LAD when he knowingly gives substantial assistance or encouragement to the unlawful conduct of his employer." *Id.* at 158. The Court stated that "[o]nce the [employer] has been found liable, the issue becomes whether under § 12(e), any employee is liable for aiding and abetting." While the *Failla* Court altered the *Tyson* Court's definition of aiding and abetting under § 12(e), it did not otherwise change *Tyson*'s holdings with regard to the liability of individual supervisors.

Koeda was a decisionmaker with regard to the terms and conditions of plaintiff's employment. First, plaintiff cites to Koeda's deposition where he explains why plaintiff was not promoted to the General Foreman position when it became available. (*Id.* at 101–104, 108.) Second, plaintiff argues that Koeda was engaged in discriminatory conduct. Richard Westbrook, a former executive at Rimtec, testified that Koeda made several remarks relating to the age of certain employees. Koeda described one employee as "being too old and not [having] enough energy to manage sales, [and said] that we needed a younger person to manage sales." (Westbrook dep. at 6–13.) Third, plaintiff contends that Koeda knew of plaintiff's complaints regarding age discrimination and failed to investigate these complaints. Koeda testified that he knew prior to August 1998, that plaintiff had made these complaints and that he might file a lawsuit, but that he chose to do nothing in response to these complaints and did not have the Company investigate them. (Koeda dep. at 122–24.) In response to the question, "Do you think you should have spoken with [Mr. Horvath about his complaints of age discrimination]," Koeda stated, "No, no, no, not to this issue, you know." (*Id.* at 126.)

Defendants are correct in their contention that "mere knowledge and/or implementation" is insufficient to meet the high standard of supervisor liability under the NJLAD. *Failla*, 146 F.3d at 159. However, they are incorrect in their assertion that plaintiff "ha[s] failed to point to a factual issue" to show that this standard has been met. While Koeda testified that he was not a decisionmaker regarding plaintiff, he was able to explain in detail why plaintiff was not promoted to the General Foreman job. In this explanation, he stated "*we* started talking, specially generate his job as UTT [sic] coordinator" and "*we* discussed first with him to finding out better suitable job instead of experienced operator line." (Koeda dep. at 101–04.) (emphasis added). He discussed plaintiff's family problems and how they affected his

getting the General Foreman position and whether plaintiff could work the hours of the job. (*Id.*) Also, as noted above, Koeda testified that plaintiff was not given the General Foreman position when it was recreated because of his technical abilities. (Koeda dep. at 102–03.) In addition, plaintiff alleges that Koeda was involved with Woods, Grzybowski and Preston in creating the job description for his current Utility Coordinator position. (Horvath dep. vol 2 at 168–70.)

█ Koeda claims to have had no involvement with the terms and conditions of plaintiff's employment, however, his testimony infers the opposite, that Koeda was a decisionmaker with regard to plaintiff. In addition, there is sufficient evidence in the record that a jury could find that Koeda had knowledge of plaintiff's claims of discrimination and failed to stop them or at least investigate them. Thus, he may have violated his duty through his "deliberate indifference or affirmative acts." *Hurley*, 174 F.3d at 126. In sum, the Court holds that plaintiff's claim under the NJLAD against defendant Koeda does not fail as a matter of law.

## IV. Statute of Limitations

In plaintiff's Complaint, he alleges that defendants' discriminatory actions include, but are not limited to the following: (1) between 1993 and 1996, plaintiff was demoted from General Foreman to day shift Production Supervisor, then demoted to night shift, Production Supervisor "all as a concerted effort to promote or place younger employees with less experience and seniority" in better positions; (2) in 1996, requiring plaintiff to take a significant salary decrease in order to acquire a day shift position, while defendants "had and continues to have, younger employees (under age forty(40)) with less experience and less seniority [ ], working in day shift position and upon information and belief making higher salaries than Plaintiff"; (3) "[i]ntentionally, knowingly, and willfully,

hiring and promoting younger individuals (under age forty (40)), to positions where plaintiff is qualified, but for which [he] has not been ... considered"; (4) paying plaintiff "a significantly lower salary [ ] than plaintiff was being paid in prior years [ ] despite [his] experience and seniority"; (5) threatening older employees that "'they must keep their qualifications up or they can be replaced by a younger person.'" (citing Memo); (6) retaliating against plaintiff for filing a Charge of Discrimination with the EEOC; (7) retaliating against plaintiff in the "terms and conditions of his employment by, ... refusing to speak to [him]; attempting to incite [him] into engaging in confrontational behavior with his supervisors; falsely accusing [him] of safety violations." (Compl. ¶ 21.)

Defendants argue that plaintiff's discrimination claims under the ADEA and the NJLAD are time barred. Specifically, they contend that three of plaintiff's "discrete complaints" of discrimination should be dismissed as time-barred under both statutes' limitations periods. They are: (1) that between 1993 and 1996 he was demoted from General Foreman to day shift Production Supervisor to midnight shift Production Supervisor[7]; (2) that in 1996, he was forced to take a significant salary decrease to acquire a day position, while allowing younger less experienced employees to work in the day shift making higher salaries; and (3) that in 1995 he and other older employees were threatened that they must keep their qualification up or be replaced by younger employees. Defendants assert that because these alleged incidents occurred after the relevant statutes of limitations had expired, their motion should be granted. In anticipation of plaintiff's response, defendants also maintain that the "continuing violation" doctrine does not apply to the facts of this case. Plaintiff argues that not only did defendants discriminate against him on the basis of his age from 1995 to 1999, but,

that his claims are not time-barred because the "continuing violation" theory applies to the alleged discriminatory conduct.

### A. ADEA Claims

Under the ADEA, a plaintiff must file charges of unlawful discrimination with the EEOC and receive a right-to-sue notice before filing a complaint in federal court. *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir.1976). Pursuant to 29 U.S.C. § 626(d)(2), such a charge must be filed with the EEOC "within 300 days after the alleged unlawful practice occurred...." In the instant case, plaintiff filed a Charge of Discrimination with the EEOC on August 27, 1998. Thus, the 300–day limitations period would ordinarily bar plaintiff's claims relating to discriminatory events that occurred prior to October 31, 1997.

■ However, the "continuing violation doctrine" allows a plaintiff to pursue his discrimination claim for "conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 480–81 (3d Cir.1997) (internal quotations omitted). To make out a continuing violation, the plaintiff must show: (1) "that at least one discriminatory act occurred within the 300–day period"; and (2) that the discriminatory incidents are "more than the occurrence of isolated or sporadic acts of intentional discrimination" and are instead "a continuing pattern of discrimination." *Id.* at 481 (internal quotations omitted). If a plaintiff meets these requirements, he may present evidence for the "entire continuing violation, and the 300–day filing period will not act as a bar." *Id.*

In *Rush*, a female employee brought a suit alleging sex discrimination, sexual harassment, constructive discharge, retali-

---

**7.** Plaintiff maintains in footnote 8 of his opposition brief, that this claim is not alleging that his position change from General Foreman to day shift Production Supervisor in 1993 was as a result of age discrimination.

ation and various state law claims against her employer. On appeal, the Third Circuit affirmed the district court's ruling that because the sexual harassment that plaintiff experienced constituted a continuing violation, her failure to meet the 300–day time limitation did not bar her claim. In reaching this decision, the Court found that the evidence "supported a finding that [plaintiff] suffered continuous sexual harassment," and that the harassment "did not consist of unrelated, isolated incidents." *Id.* at 483. The Court also stated that "it is clear that there were episodes of alleged harassment after [she filed her Charge with the EEOC]." *Id.*

■ In this case, the Court holds that plaintiff has put forth sufficient evidence to show that he suffered a continuing violation. First, plaintiff's Complaint and submissions allege various incidents of discrimination beginning in approximately 1995 and continuing through 1998. Also, much of the alleged discriminatory conduct took place "within the 300–day period." Second, while the defendants assert that three of plaintiff's allegations are discrete incidents, thus, not an ongoing pattern of discrimination, the record and plaintiff's Charge with the EEOC make clear that his allegations are "more than the occurrence of isolated or sporadic acts." *Id.* at 481.

To determine whether a series of acts form an "ongoing pattern of discrimination," the Third Circuit has adopted the approach of the Fifth Circuit. *Id.* at 482 (applying *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971 (5th Cir.1983)). The *Berry* Court explained:

The first [factor] is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor ... is degree of permanence. Does the act have the degree of permanence which would trigger an employee's awareness which would trigger an employee's awareness of and duty to assert his or her rights.

*Berry,* 715 F.2d at 981.

■ Plaintiff's submissions show that over at least a four year period many incidents occurred that could be construed as age discrimination. There is also ample evidence in the record to show that although plaintiff was technically qualified for certain positions, he was never considered for them; instead, these positions were given to younger, less experienced persons. Furthermore, the record indicates that plaintiff was assured by his supervisors that he would be moved back into production. Overall, testimony in the record by current and past employees of Rimtec combined with plaintiff's allegations show that Rimtec had a policy of discrimination aimed at replacing older employees with younger ones and that their actions "demonstrate a continuing pattern of discrimination." (*See* Russell dep. at 45, 58–60; Eckman dep. at 57.) Thus, plaintiff's allegations are sufficient to support the use of the continuing violation theory.[8]

---

**8.** In their reply brief, defendants also argue that all of plaintiff's ADEA claims alleging discriminatory conduct prior to 1996 are barred because he has failed to exhaust his administrative remedies with the EEOC. (Def. reply at footnote 7.) However, because an EEOC Charge is brought by lay employees without knowledge of legal requirements, an employee is not held strictly to his claims in the Charge. *Love v. Pullman,* 404 U.S. 522, 527, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). The Third Circuit has stated that "[o]nce a charge of some sort is filed with the EEOC, ... the scope of a resulting private civil action is defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," regardless of the actual scope of the EEOC investigation. *Hicks v. ABT Assocs.,* 572 F.2d 960, 963 (3d Cir.1978) (internal quotations omitted). Although plaintiff's Charge of Discrimination with the EEOC focuses on events that occurred in 1998, he references the managerial Memo from 1995 to show Rimtec's

### B. NJLAD Claims

The statute of limitations for claims brought under the NJLAD is two years. *Montells v. Haynes,* 133 N.J. 282, 627 A.2d 654 (1993). Defendants argue that because plaintiff's Complaint was filed on February 16, 1999, any allegations of discriminatory conduct brought under the NJLAD must have occurred on or after February 16, 1997, or they are barred by the statute of limitations. However, discrimination claims brought under the NJLAD are governed by the same standards and burdens of proof as the ADEA and New Jersey recognizes the continuing violation theory. *Terry v. Mercer Co. Bd. of Chosen Freeholders,* 173 N.J.Super. 249, 414 A.2d 30 (App.Div.1980). Thus, the analysis above applies to plaintiff's claim under the NJLAD and it will not be dismissed as untimely.

### V. Demotion Claim

Defendants assert that even if plaintiff's discrimination claims are not barred by the statute of limitations, he is unable to establish a prima facie case on his claim that he was demoted when the General Foreman position was abolished and he was returned to his prior day shift Production Supervisor position ("demotion claim"). In response, however, plaintiff maintains that his intention was never to assert such a claim. Both parties are in agreement that plaintiff's move from General Foreman to day shift production Supervisor was a result of the Company's financial instability and that he worked the same hours and received the same salary and benefits. Thus, there is no demotion claim.

### VI. Plaintiff's Qualifications

Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with re-

spect to compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). It further provides that it is "unlawful for an employer ... to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." *Id.* at § 623(a)(2).

■ In cases brought under the ADEA, the plaintiff carries the burden of establishing a prima facie case of unlawful discrimination by showing that: (1) he belongs to a protected class ("individuals who are at least 40 years of age," 29 U.S.C. § 631(a)); (2) he was otherwise qualified for the position/s at issue; (3) he suffered an adverse employment action; and (4) the circumstances of plaintiff's rejection or replacement create an inference of age discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000); *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.,* 142 F.3d 639, 644 n. 5 (3d Cir.1998); *see Waldron v. SL Industries, Inc.,* 56 F.3d 491, 494 n. 3 (3d Cir.1995) (determining that the precise elements of a plaintiff's prima facie case may vary with the particular circumstances of each case).

In his Complaint, plaintiff asserts that he was denied the positions of Color Matcher and Environmental Safety Manager due to age discrimination. (Compl. at ¶ 21(c).) Defendants argue that plaintiff has failed to show that he was objectively qualified for either position. *Sempier v. Johnson & Higgins,* 45 F.3d 724, 729 (3d Cir.1995) (holding that qualifications are based on an objective standard). The Color Matcher position is part of Rimtec's research and development department

alleged policy and pattern of discrimination over the years. Thus, while the Court holds that plaintiff's claims of discrimination that occurred prior to the 1995 Memo were not exhausted for ADEA purposes, all allegations

after 1995, were within the scope of the EEOC Charge. *See, e.g., Howze v. Jones & Laughlin Steel, Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984).

chaired by Jeffrey Nash, Rimtec's Vice President for Research and Development. Mr. Nash testified that when he filled the Color Matcher position in early 1998, he sought a candidate with a high degree of proficiency in chemistry; extensive experience in color matching; and an expertise in using color matching computer software. (Nash aff. at ¶ 4.) In addition, Nash claims that had to hire a person "off the street" for the Color Matcher position because no one at Rimtec, including plaintiff, possessed these qualifications. (*Id.* at ¶ 5.) He hired Lawrence Coates (47 years old at the time), who possessed at least fifteen years of experience in the color matching field. (*Id.* at ¶ 6.)

In response, plaintiff argues that a genuine issue of material fact exists as to whether he was qualified for the Color Matcher position because two former Rimtec Color Matchers, Woods and Eckman, testified that plaintiff was capable of handling the position. (Woods dep. at 48–49, 68; Eckman dep. at 58.) Moreover, based on his own experience as a Color Matcher, Woods described the skills required to do the job as "proficien[cy] in math, good eyesight, maybe just a little bit of common sense. And just some background knowledge of what you're using." (*Id.* at 48.) Woods further explained that based on his personal experience, the position is a "trial-and-error job . . . [that] you kind of learn on the go." (*Id.* at 49.)

■ Because the evidence in the record is contradictory as to the qualifications of a Color Matcher, summary judgment on this claim is inappropriate. Although Nash has laid out what he describes as the job qualifications for the position, Rimtec has not provided the Court with any Company document that contains a job description nor has it provided any type of Color Matcher job announcement. Such a document would allow the Court to examine the objective qualifications of the position. Furthermore, it appears from the record that Woods himself, who previously held the Color Matcher position, would not be

qualified under Nash's criteria. Accordingly, without more than Nash's affidavit, and examining the evidence in the light most favorable to the non-moving party, the Court holds that a genuine issue of material fact exists as to whether plaintiff was qualified for the Color Matcher position.

Defendants also argue that plaintiff was not qualified for the position of Environmental and Safety Manager. Plant Executive Charles Goldman, who supervised the Environmental and Safety Manager, testified that in the Spring of 1998, after Grzybowski was moved from the Environmental and Safety Manager position to another position, he had to hire a replacement. (Goldman aff. at ¶ 2.) He stated that at that time, he determined that he would fill the position with a college graduate with a degree in a particular relevant area. (*Id.* at 3.) Defendants contend that because no one at Rimtec possessed such a degree, he sought candidates "off the street." (*Id.* at ¶ 405.) Mr. Goldman hired Joseph Gormley (age 25 at the time), who held a degree in Occupational Safety, to fill the position. (*Id.* at 6–7.) Defendants also argue that plaintiff's statement in a December 9, 1997, letter to plant management where he wrote that after meeting with Mr. Goldman, he "d[id] not feel it would be in the best interest of the Company or myself to report to him," shows that he was incompatible with Mr. Goldman and unqualified for the Environmental and Safety Manager position.

■ Once again, a genuine issue of material fact exists as to whether plaintiff was qualified for the position of Environmental and Safety Manager. First, based on the parties' submissions, Grzybowski, who had previously held the position, did not hold the alleged required college degree to work in the Environmental and Safety Manager position. Furthermore, he had much less experience and seniority at Rimtec than plaintiff. In fact, as discussed above, plaintiff trained Mr. Grzybowski. Thus, while it may be true that Mr. Gold-

man changed the qualifications of the position right after Grzybowski left the position, defendants again have submitted no official document or job announcement explaining this change in qualifications. Also, Woods stated that plaintiff was "qualified or more qualified than a whole bunch of people [at Rimtec] to be ... safety manager." Second, defendants' argument relating to plaintiff's incompatibility with Mr. Goldman has nothing to do with whether he was qualified for the Environmental and Safety Manager position. Accordingly, a genuine issue of material fact exists as to whether plaintiff was qualified for the Environmental and Safety Manager position.

## VII. Retaliation Claim

The ADEA provides that:

It shall be unlawful for an employer to discriminate against any of his employees ... because such individual, ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d). The standards for establishing a retaliation claim under Title VII and the ADEA are the essentially the same. In order to establish a prima facie case of discriminatory retaliation under Title VII or the ADEA, plaintiff must show (1) that he engaged in protected activity; (2) that the employer took adverse action against him; and (3) that a causal link exists between the protected activity and the employer's adverse action. *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997). The legal standards for evaluating retaliation claims under the ADEA and the NJLAD are the same. *See, e.g., Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445, 452 (1993).

Plaintiff alleges that defendants have "retaliat[ed] against [him] because of his expressed opposition to the offensive discriminatory conduct in the workplace" and have "subject[ed him] to more onerous working condition." (Compl. at ¶ 31, 39.) He further maintains that shortly after he filed a Charge of Discrimination with the EEOC on August 30, 1998, he received his yearly evaluation from his supervisor, Grzybowski. Although Grzybowski stated that plaintiff's evaluation was better than most of the other employees he evaluated, plaintiff did not receive a raise in January 1999, when the other Rimtec employees received their raises. In addition, plaintiff has submitted evaluations for two other Rimtec employees who were reviewed by Grzybowski. Although, William Evert, over age 40, and Nick Evert, under age 40, both received evaluations that were worse than plaintiff's, Nick Evert, received a raise while Bill Evert and plaintiff did not.[9] (*See* Pl.Ex. N.)

Plaintiff argues that this course of events shows a casual connection between his filing a Charge of Discrimination in August of 1998, and Rimtec's failure to give him a raise in January of 1999. Furthermore, it connects plaintiff's filing of the instant lawsuit in February of 1999 and Rimtec's retroactive application of a raise to January of 1999. He also alleges that Rimtec's refusal to move plaintiff back into production, despite his supervisors' requests and belief that his skills and experience could be better utilized there, is an adverse employment action. Lastly, plaintiff maintains that he has been denied computer training, despite his repeated requests, while other younger employees have been immediately enrolled in training programs and that he has been "ignored, shunned, and excluded from meetings by Rimtec's upper level management." (Horvath dep. vol. 2 at 235–37; vol. 3 at 30–33.)

---

**9.** In February, 1999, an executive meeting was held to address Rimtec's failure to give plaintiff a raise. Following this meeting, plaintiff was given a raise which was applied retroactively to January of 1999. (Johnston dep. at 59.)

Defendants contend that plaintiff cannot establish that he suffered an adverse employment action, hence, he has not made out a prima facie case of retaliation. Defendants contend that plaintiff ultimately received his raise and it was applied retroactively. They also argue that "Rimtec's refusal to move [plaintiff] back into production" is not adverse action without more specifics and his claim that he was denied computer training is not mentioned in his Complaint nor claimed as retaliation in his deposition.

 Defendant is correct in its contention that plaintiff has not suffered an adverse employment action that is causally connected to his filing a Charge of Discrimination with the EEOC. Although there is no doubt that defendants failed to give plaintiff a raise in January of 1999 which was at the same time that he filed his Charge with the EEOC, he was ultimately awarded his raise and it was applied retroactively. Because plaintiff was "ultimately rewarded" his raise, he did not suffer an adverse employment action. *Howze v. Virginia Polytechnic,* 901 F.Supp. 1091, 1096 (W.D.Va.1995).

 To make out an adverse employment action, a plaintiff must show that it "adversely affect[ed] professional reputation or ability to gain future employment." *Id.* (citing *Nelson v. Upsala College,* 51 F.3d 383, 387 (3d Cir.1995)). In this case, plaintiff's assertions that he suffered an adverse employment action because he was not moved back to a production position and because he did not receive computer training [10] do not rise to the level of an adverse employment action. Plaintiff makes no argument that these alleged actions adversely affected his professional reputation. Furthermore, as defendants contend, although plaintiff was not moved back into a production job, after filing a Charge with the EEOC and this lawsuit, he has remained in the posi-

tion of Utility Coordinator at the same salary with the same benefits. Accordingly, because plaintiff has failed to show that a causal link exists between protected activity and Rimtec's alleged employment action, his retaliation claim pursuant to the ADEA and the NJLAD must fail.

## VIII. Remaining Claims

Along with his claims alleging discrimination, plaintiff brings state law claims for negligent infliction of emotional distress, intentional infliction of emotional distress and malicious interference with existing employment relations or with prospective economic advantage. In addition, Mrs. Horvath brings a claim for loss of consortium.

First, because plaintiff concedes that he is unable to make out a prima facie case for negligent infliction of emotional distress, defendants' motion for summary judgment on this claim is granted without discussion.

 Second, defendants' are correct that plaintiff's claim for intentional infliction of emotional distress fails as a matter of law. To establish an intentional infliction of emotional distress claim under New Jersey law, a plaintiff must show (1) that the defendant intended to cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the actions proximately caused emotional distress; and (4) that plaintiff's emotional distress was severe. *Buckley v. Trenton Saving Fund Soc.,* 111 N.J. 355, 544 A.2d 857 (1988); *DeJoy,* 968 F.Supp. at 966.

 To establish extreme and outrageous conduct, a plaintiff must show conduct " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Buckley,* 111

---

**10.** Plaintiff does not allege this claim in his Complaint nor does he explain it further in his deposition.

N.J. 355, 544 A.2d 857 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). The Court notes that "the limited scope of the tort tolerates many kinds of unjust, unfair and unkind conduct." *Fregara v. Jet Aviation Business Jets*, 764 F.Supp. 940, 956 (D.N.J.1991) (quoting *Cautilli v. GAF Corp.*, 531 F.Supp. 71, 74 (E.D.Pa. 1982)). This is especially true in the employment context. In fact, courts have held that discrimination alone does not state a claim for intentional infliction of emotional distress. *Nichols v. Acme Markets, Inc.*, 712 F.Supp. 488 (E.D.Pa.1989) (holding that racial discrimination alone does not state a claim for intentional infliction of emotional distress). Here, plaintiff has not shown conduct sufficiently extreme and outrageous to constitute intentional infliction of emotional distress. Accordingly, his claim fails on its merits and summary judgment will be granted to defendants.

■ Third, plaintiff asserts a claim of malicious interference with existing employment relations or with prospective economic advantage against defendants Johnston and Koeda. To make out such a claim, a plaintiff must show the following four elements: "(1) a reasonable expectation of economic advantage to plaintiff; (2) interference done intentionally and with 'malice'; (3) causal connection between interference and the loss of prospective gain; and (4) actual damages." *DeJoy*, 941 F.Supp. at 477 (citing *Printing Mart–Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 563 A.2d 31 (1989)).

■ New Jersey courts have ruled that it is "fundamental" to a cause of action for tortious interference with prospective economic advantage that "the claim be directed against defendants who are not parties to the relationship." *Printing Mart*, 563 A.2d at 37. In addition, federal courts have held that such claims brought by an employee against a supervisor acting in the course of his employment must be dismissed. *See Michelson v. Exxon Research and Engineering Co.*, 808 F.2d 1005, 1007–08 (3d Cir.1987) (applying Pennsylvania law); *DeJoy*, 941 F.Supp. at 478; *Obendorfer v. Gitano Group, Inc.*, 838 F.Supp. 950–956 (D.N.J.1993). Thus, only when an employee asserts that an officer or agent of corporation acted outside the scope of his employment and/or for his own personal gain may the employee go forward with his claim for tortious interference. *DeJoy*, 941 F.Supp. at 478. In the instant case, plaintiff makes no assertions in either his Complaint or his briefs that defendants Johnston or Koeda acted outside the scope of their employment and/or for their own personal gain. In fact, plaintiff fails to address this argument in his response brief. Accordingly, plaintiff's claims against defendants Johnston and Koeda for tortious interference must fail as a matter of law.

■ Lastly, plaintiff Mrs. Horvath asserts a claim for loss of consortium against defendants. She alleges that she has "been deprived of the comfort, care companionship, society, consortium, and services of her spouse." (Compl. at ¶ 86.) Loss of consortium claims may be brought by a spouse for injury to his or her spouse arising from a tort. *Reilly v. Prudential Prop. & Casualty Ins., Co.*, 653 F.Supp. 725, 735 (D.N.J.1987). The right of the spouse to recover on a loss of consortium claim depends upon the existence of tortious conduct on the part of the defendants. *Id.* In addition, such recovery cannot be founded solely on a spouse's economic loss. *Cappiello v. Ragen Precision Indus. Inc.*, 192 N.J.Super. 523, 471 A.2d 432 (1984).

■ In the instant case, Mrs. Horvath bases her loss of consortium claim on plaintiff's tort claims for negligent and intentional infliction of emotional distress or his claim for malicious interference. She also infers that as a result of the alleged discrimination and retaliation against her husband, she is entitled to relief. However, this Court has already dismissed plaintiff's tort claims for negligent and inten-

tional infliction of emotional distress and malicious interference. In addition, the Third Circuit has held that *per quod* damages for loss of consortium are not recoverable under the NJLAD. *Hurley*, 174 F.3d at 130.

In *Hurley*, the Court explained that the New Jersey Appellate Division rejected a claim to recover *per quod* damages for loss of consortium in *Catalane v. Gilian Instrument Corp.*, 271 N.J.Super. 476, 638 A.2d 1341 (1994). *Id.* The *Catalane* court held that "the Legislature did not intend to establish a cause of action for any person other than the individual against whom the discrimination was directed." *Id.* at 1353 (citing N.J.S.A. § 10:5-3). In reaching this conclusion, the court reasoned that "[i]f per quod claims were to be allowed under the Act, the Legislature would have so noted in light of its careful recitation of the damages it intended to allow." *Catalane*, 638 A.2d at 1353. Based on the *Catalane* the Third Circuit predicted "that the New Jersey Supreme Court would follow *Catalane* and conclude that the LAD makes no provision for such an ancillary claim" and affirmed the district court's motion for summary judgment on plaintiff's loss of consortium claim.

In this case, without any remaining tort claims, Mrs. Horvath's loss of consortium claim is reliant on her husband's claim under the NJLAD. Because such a claim has been rejected by the Third Circuit and the New Jersey Appellate Division, Mrs. Horvath's claim fails as a matter of law.

## IX. Conclusion

For the reasons set forth above, defendants' motion for summary judgment is granted on plaintiff's claims for retaliation under the ADEA and the NJLAD. His state claims for negligent infliction of emotional distress, intentional infliction of emotional distress and tortious interference with prospective economic advantage are also dismissed as is Mrs. Horvath's claim for loss of consortium. In addition, all claims brought under the ADEA against individual defendants Koeda and Johnston are dismissed. However, defendants' motion is denied on plaintiff's claims against Rimtec for discrimination under the ADEA and his claims for discrimination against Rimtec and Koeda under the NJLAD. The Court will enter an appropriate order.